Argued and submitted April 12, affirmed on appeal, affirmed on cross-appeal
December 4, 1985, reconsideration denied February 14, petition for review denied
March 11, 1986 (300 Or 605)

In the Matter of Leilani Tucker, a child.

STATE ex rel JUVENILE DEPARTMENT
OF LANE COUNTY et al,
*Respondents - Cross-Respondents,*
TUCKER,
*Respondent - Cross-Appellant,*

*v.*

TUCKER,
*Appellant - Cross-Respondent.*

(81-128; CA A31461)

710 P2d 793

Terrance P. Gough, Eugene, argued the cause for appellant - cross-respondent Faith Marie Tucker. With him on the briefs was Thomsen, Gough & Gough, Eugene.

Linda J. DeVries, Assistant Attorney General, Salem, argued the cause for respondents - cross-respondents Juvenile Department and Children's Services Division. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

William A. Furtick, Eugene, argued the cause and filed the brief for respondent - cross-appellant.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

**ROSSMAN, J.**

The state brought this action to terminate mother's parental rights. The father is unknown. The court determined that the child is an "Indian child," according to the Indian Child Welfare Act, 25 USC § 1901 *et seq* (ICWA), and that, therefore, the termination proceedings are governed by the ICWA, as well as by ORS 419.523, 419.525 and 419.527. Mother appeals from an order terminating her parental rights, contending that the ICWA was not complied with in several respects. The child cross-appeals, arguing that it was error to apply the ICWA, because she is not an Indian child. We affirm.

On March 17, 1981, Children's Services Division (CSD) petitioned the juvenile court, alleging that the child, then two and one-half years old, was within the jurisdiction of the court, because mother had failed to provide for her well-being. ORS 419.476(1)(e); 419.482(1). The petition identified mother's mental and emotional state as the cause of her failure to provide for the child. A temporary commitment order was granted the following day. ORS 419.482(3).

On July 2, 1981, mother admitted the allegations of the March 17 petition, which had been renewed in an amended petition dated July 1, thus empowering the court to exercise dispositional authority over the child. ORS 419.500(1); 419.505. The child was then returned to mother under the supervision of CSD. Mother had the child only a few days, however, before returning her to CSD, which in turn requested another order of temporary commitment. On January 22, 1982, the court held a dispositional hearing and, on January 25, it made the child a ward of the court, placed her in the legal custody of CSD and ordered CSD to place the child in foster care. ORS 419.507(1); 419.507(1)(b).

In the spring of 1982, mother became aware that the ICWA might apply to her case, and on November 5, 1982, she moved the court to "invalidate" the foster care placement for failure to apply the ICWA. On December 14, 1982, having considered mother's petition, the court granted a continuance to allow the parties additional time to gather and present evidence on whether the child is an Indian child, as defined by the ICWA. There is no record that the court ever ruled on the November 5 motion.

On April 4, 1983, the state filed a petition to terminate mother's parental rights.[1] ORS 419.523; 419.525. The parties continued to gather information on whether the child is an Indian child and, on December 13, 1983, the court determined that the child is an Indian child for purposes of the ICWA. On March 21, 1984, mother petitioned the court to "invalidate" the termination proceedings, again arguing that the state had failed to comply with the ICWA. That petition was denied on March 27, 1984, the day trial began.

On March 30, 1984, the court found that the state had proved the allegations in the petition beyond a reasonable doubt and that it was in the best interests of the child to terminate mother's parental rights. The court also found beyond a reasonable doubt that rehabilitative efforts were made to prevent the breakup of the family and that mother's continued custody of the child would cause the child serious emotional damage. The court ordered termination of mother's parental rights.

Mother first contends that the court erred when it denied her petition to invalidate the foster care placement,

---

[1] The petition alleged, in part:

"4) The parental rights of Faithe [*sic*] Marie Tucker to the above-named child, should be terminated on the grounds that Faithe [*sic*] Marie Tucker is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into her home is improbable in the foreseeable future due to conduct or conditions not likely to change, to wit:

"a) the mother's relinquishment of the child to the care and custody of public child caring agencies for substantial periods of time with little or no contact with the child during those times.

"b) Emotional or mental illness of the mother.

"c) Lack of effort of the mother to adjust her circumstances, conduct or conditions or make return of the child possible or failure of the mother to effect a lasting adjustment after reasonable efforts by available social service agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"5) The parental rights of Faithe [*sic*] Marie Tucker should be terminated because she has failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for one year prior to the filing of this petition as shown by:

"a) The mother's failure to provide care or pay a reasonable portion of substitute physical care and maintenance while the child has been lodged with others."

These allegations state grounds for termination under ORS 419.523(2) and (3).

arguing that the state and the court failed to comply with the ICWA during the jurisdictional and dispositional proceedings that led to placement.[2] The state concedes that the ICWA was not complied with but contends that the 1982 placement need not be invalidated, because the ICWA did not apply to those proceedings. We agree with the state.

The ICWA applies to involuntary proceedings for foster care placement or termination of parental rights when the court "knows or has reason to know that an Indian child is involved." 25 USC § 1912(a); *Angus v. Joseph,* 60 Or App 546, 549, 655 P2d 208 (1982), *rev den* 294 Or 569, *cert den* 464 US 830 (1983).

25 USC § 1903 provides, in part:

"(4) 'Indian child' means any unmarried person who is under age 18 and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe;

"* * * * *

"(8) 'Indian tribe' means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Department of the Interior] because of their status as Indians, including any Alaska Native village as defined in section 1602(c) of Title 43 * * *."

Before a parent or a tribe qualifies for the benefit of the ICWA, it must be established that the child meets the definitional criteria. *Angus v. Joseph, supra.* Here, there was no determination that the child was an Indian child within the meaning of the ICWA until December 12, 1983, approximately

---

[2] It is not clear whether mother refers here to the November 5, 1982, petition to invalidate foster care placement, which, apparently, the court never ruled on, or the March 21, 1984, petition to invalidate the termination proceedings. In the latter petition, she seems to have renewed her challenge to the foster care placement. This uncertainty does not affect our discussion of mother's argument. The petitions were brought under 25 USC § 1914, which provides:

"Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title."

two years after the dispositional order of foster care placement. Therefore, the proceedings underlying the placement cannot be invalidated for failure to comply with the ICWA, unless the court had reason to know during those proceedings that the child was an Indian child.

The proceedings began on March 17, 1981. On April 27, 1981, CSD wrote to Alaskan authorities to obtain information concerning mother's Indian status. On May 5, 1981, the Bristol Bay Native Association confirmed that mother is a three-eighths Alaskan native. Concerning the child's status, they stated:

> "According to the Alaska Claims Settlement Act anyone born after December 18, 1971, cannot be enrolled as a shareholder. Therefore, [the child] is not a shareholder but is the dependent of an Alaskan native."

On September 18, 1981, CSD contacted the United States Bureau of Indian Affairs (BIA), which responded on September 21, 1981:

> "In view of the fact that the father is unknown, we researched the records of the mother * * *. The Alaska enrollment office advised me that [mother] is three-eighths Aleut and a registered member of the Bristol Bay Corporation. [The child's] blood degree would be three-sixteenths Aleut. The criteria [sic] for enrollment is one-quarter degree Indian blood; therefore, [the child] would not be eligible for enrollment nor is she eligible for Bureau services.
>
> "Because [the child] is not eligible for enrollment, the provisions of P.L. 95-608, Indian Child Welfare Act, do not apply."

At that point, CSD concluded that the child was not an Indian child for purposes of the ICWA, and that conclusion was supported by the record as it existed at that time.[3]

---

[3] The "guidelines for state courts," 44 Federal Register 67584, 67586 (1979), identify criteria for determining that a child is an Indian child:

"(a) When a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe. * * *

"* * * * *

"(b)(i) The determination by a tribe that a child is or is not a member of that tribe, is or is not eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive.

No other evidence was presented to CSD or the court before the final dispositional order on January 22, 1982. Therefore, we hold that the ICWA did not apply to the jurisdictional and dispositional proceedings and that the court did not err in denying mother's petition to set aside the court's order of foster care placement.

We turn now to the child's argument that the court erred in finding that she is an Indian child and in applying the ICWA.

As noted above, on November 5, 1982, mother filed a petition to invalidate the foster care placement, asserting that the child was an Indian child. The court reserved its determination through two hearings and allowed the parties to obtain further information on that issue. At the second hearing, on March 2, 1983, mother said that she was waiting for a response from the Chignik village in Alaska, which was her ancestral village. Before that time, the state did not know the name of mother's ancestral village. On March 7, 1983, the Attorney General wrote to the Chignik Traditional Council to request its assistance in determining whether the child was a village member or was eligible for membership. The department also advised the council that the child was a ward of the juvenile court and that it had a right to intervene. The return receipt indicated that the village council president received the letter on March 15, 1983. There was no response.

On December 7, 1983, the president was deposed by telephone. She testified that the village council had concluded that the child was eligible for village membership. On December 12, 1983, the court determined that the child is an Indian child, as defined by the ICWA. The child contends that that determination was improper, because she does not meet the definition of "native" under the Alaska Native Claims Settlement Act, 43 USC § 1601 *et seq* (ANCSA).

---

"(ii)    Absent a contrary determination by the tribe that is alleged to be the Indian child's tribe, a determination by the Bureau of Indian Affairs that a child is or is not an Indian child is conclusive."

Although the "guidelines" do not have legislative effect, 44 Federal Register 67584 (1979), they are helpful, and we agree that, in the absence of a contrary determination by the tribe, a determination by the BIA concerning the child's Indian status is conclusive.

We reject the child's argument, because it is irrelevant whether she is a "native," as defined by ANCSA. The provisions of ANCSA generally apply to issues regarding

"* * * compensation for the extinguishment of claims to land, and shall not be deemed to substitute for any governmental programs otherwise available to the Native people of Alaska as citizens of the United States and State of Alaska." 43 USC § 1626(a).

ANCSA created profit-making business corporations to manage lands and funds distributed under the Act. ANCSA did not affect the ability of traditional village governments to carry out their sovereign powers. *See generally* Cohen, *Handbook of Federal Indian Law* 752-56 (1982). One of those powers is to determine membership criteria and to decide who meets those criteria.

■ It is undisputed that, as an Alaskan native and a shareholder in an ANCSA corporation, mother is a member of an Indian tribe. It is also undisputed that the native village of Chignik has determined that the child is eligible for membership in the village. The only issue, therefore, is whether that determination supports the court's ruling that the child is an Indian child, even though the village does not have established membership criteria.

In *Angus v. Joseph, supra,* 60 Or App at 552-53, we stated:

"[T]he ICWA itself contains no definition of membership in an Indian tribe. In the absence of a congressional definition, an Indian tribe has authority to determine its own membership. * * * Formal membership requirements differ from tribe to tribe, as do each tribe's method of keeping track of its own membership. There is thus no one method of proof of membership, but the testimony of a representative of the tribal government would be probative evidence of membership." (Citations omitted.)

We conclude that the testimony of the president of the native village council was sufficient to prove that the child is eligible for membership in an Indian tribe and that, therefore, she is an Indian child.[4]

_____

[4] The child argues that the absence of formal membership criteria violates her due process rights. We do not address that argument, because it was not raised at trial. *State v. Evans,* 290 Or 707, 713-14, 625 P2d 1300 (1981).

We now return to mother's appeal and consider her second contention: that the court erred in terminating her parental rights. That contention is based on several arguments. First, she argues that the state made no effort to involve her tribe in the proceedings. We disagree.

25 USC § 1912(a) provides, in part:

> "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the * * * termination of parental rights to, an Indian child shall notify * * * the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. * * *"

As noted above, when the state learned the name and location of mother's ancestral tribe, it wrote to the village council. That letter requested the council's assistance in determining whether the child was eligible for village membership and advised it that the child was a ward of the court and its right to intervene at any stage of the proceedings. The letter was received by the village council president on March 15, 1983, approximately one year before trial in the termination proceedings. There was no response to the letter. Further, during the deposition of the president on December 6, 1983, she stated that the tribe did not intend to intervene. Finally, on January 20, 1984, the state provided formal notice by certified mail to the village council of the pendency of the termination proceedings. The notice was received by the village council president, but again the tribe chose not to intervene. We hold that the state complied with the notice requirements of 25 USC § 1912(a).

Mother next argues that the state made no effort to provide her with remedial services and rehabilitative programs. 25 USC § 1912(d) provides:

> "Any party seeking to effect * * * termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

The court found that CSD had provided remedial services designed to prevent the breakup of the family and that they were unsuccessful. The evidence in the record supports the court's conclusion.

■      Finally, under her second assignment, mother argues that the order terminating parental rights was not supported by evidence beyond a reasonable doubt, because the state did not present qualified expert testimony, as required by the ICWA. She contends that the experts were not qualified, because they possessed no special knowledge of the social and cultural aspects of Indian life. The state does not argue persuasively that the experts did possess special knowledge of Indian life, but it contends that they were nevertheless qualified, because they had the necessary expertise to establish beyond a reasonable doubt that mother's continued custody of the child would likely result in serious physical or emotional damage to the child, which is the proof required by the ICWA for termination of parental rights.

25 USC § 1912(f) provides:

> "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

In *State ex rel Juv. Dept. v. Charles,* 70 Or App 10, 15, 688 P2d 1354 (1984), *rev allowed* 298 Or 427, 698 P2d 48, *petition dismissed* 299 Or 341, 701 P2d 1052 (1985), a child custody proceeding under the ICWA, we interpreted the meaning of the phrase "qualified expert witness" in 25 USC § 1912(e).[5] The phrase has the same meaning in subsection (f). In *Charles,* "two experienced social workers" testified for the state in support of foster care placement; neither possessed specialized knowledge of the social or cultural aspects of Indian life. The mother's expert, a board-certified psychiatrist, who had been a consultant to the Urban Indian Council, provided contrary testimony. We held that, given the testimony of the mother's expert, the testimony of the state's

_____

[5] 25 USC § 1912(e) provides:

"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

witnesses did not provide the clear and convincing evidence necessary to order foster care placement. We also stated that, as a "general proposition * * * an expert witness within the meaning of that term in 25 USC § 1912(e) must possess special knowledge of social and cultural aspects of Indian life." 70 Or App at 16 n 3.

We do not question the holding in *Charles* or its statement of a general proposition. However, we conclude that this case presents an exception. As noted in *Charles,* the House Report for the Indian Child Welfare Act identifies the problem sought to be resolved by the "qualified expert witness" provision:

> "The courts tend to rely on the testimony of social workers who often lack the training and the insights necessary to measure the emotional risk the child is running at home. In a number of cases, the AAIA [Association of American Indian Affairs] has obtained evidence from competent psychiatrists who, after examining the defendants, have been able to contradict the allegations offered by the social workers. Rejecting the notion that poverty and cultural differences constitute social deprivation and psychological abuse, the association argues that the state must prove that there is actual physical or emotional harm resulting from the acts of the parents." 70 Or App at 16 n 3.

The problem was identified as cultural bias, and the solution was to require qualified expert witnesses to provide the testimony necessary to prove that continued custody of the parents or Indian custodians is likely to result in serious physical or emotional damage to the child. Consistently with the purpose of the "qualified expert witness" provisions, the "guidelines for state courts," 44 Federal Register 67584 (1979), promulgated by the BIA, state that the persons who are "most likely" to meet the requirements for a qualified expert witness possess special knowledge of the social and cultural aspects of Indian life. 44 Federal Register 67593. That is the general proposition the *Charles* court agreed with.

However, when cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life. Here, the issue before the court was whether the continued custody of the child by mother would result in serious emotional harm to the child because of mother's mental illness. There was no dispute

about that condition or its severity. Termination or not had nothing to do with mother's fitness to care for the child according to the cultural dictates of her tribe. We hold that the state's experts provided proof beyond a reasonable doubt that the continued custody of the child by mother would inflict severe emotional damage on the child.

In her last assignment, mother contends that the court erred when it applied the "best interests of the child" standard to a termination proceeding governed by the ICWA. We believe that mother has misinterpreted the court's ruling. The court ruled:

> "Counsel argues that the court should not consider the best interests of the child but should consider the best interests of the tribe. I would refer counsel to section 3 of 25 USC 1902 which is essentially the preamble to the Act when it says, 'the Congress hereby declares that it is the policy of this nation to protect the best interests of Indian children * * *.' That's the first thing it says.

> "So I would think that that's the first obligation upon the court, which is the obligation of the court under the juvenile code to protect the best interests of the child 'and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families * * *.' "

The court correctly identified the relationship between the juvenile code and the ICWA. The best interests of a child are pertinent to a termination proceeding governed by federal and state law. 25 USC § 1902 provides:

> "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique value of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."

The policy expressed in section 1902 is implemented by the minimum federal standards for child custody and termination proceedings. The juvenile court realized that considering the best interests of the Indian child and applying the minimum

federal standards of the ICWA were consistent obligations. The court did not err in its ruling.

Affirmed on appeal; affirmed on cross-appeal.