ADOPTION OF ARNOLD
(and two companion cases[1]).

No. 99-P-1726.

Bristol. September 15, 2000. - January 25, 2001.

Present: LENK, DREBEN, & GILLERMAN, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing
with parent's consent to adoption. *Evidence,* Child custody proceeding,
Hearsay. *Statute,* Construction. *Indian Child Welfare Act.*

Discussion of the history and purpose of the Indian Child Welfare Act (ICWA),
    25 U.S.C. §§ 1901 et seq. (1978), governing parental rights termination
    proceedings. [747-749]
The record of a proceeding to dispense with parental consent to adoption,
 ·  involving an Indian father and governed by the Indian Child Welfare Act,
    25 U.S.C. §§ 1901 et seq., supported the conclusion that the children's
    tribe was timely notified of the pending State court proceeding pursuant to
    25 U.S.C. § 1912(a), when the Department of Social Services and the
    court became aware that the children were Indian. [749-750]
Evidence in a proceeding to dispense with parental consent to adoption sup-
    ported the judge's findings of fact. [750-751]
In a proceeding to dispense with parental consent to adoption, the judge
    properly admitted, under G. L. c. 233, § 82, the hearsay statements of the
    children relative to their parents' sexual abuse of them, where the evidence
    supported the judge's findings that the children's statements were reliable
    and that there was corroborating evidence of the children's disclosures.
    [751-754]                                    ·
In a proceeding to dispense with parental consent to adoption, the evidence of
    the parent's unfitness and the likelihood of serious physical or emotional
    damage to the children if returned to their father's care was sufficient
    beyond a reasonable doubt to support the termination of parental rights.
    [754-755]

PETITIONS filed in the Bristol Division of the Probate and Fam-
ily Court Department on November 22, 1993.
The cases were heard by *Anthony R. Nesi,* J.
*Daniel R. Katz* for the father.

[1]Adoption of Jake and Adoption of Brian, Arnold's siblings. All the names
are fictitious.

*Ginny Sinkel,* Assistant Attorney General, for Department of Social Services.

*Kevin D. Ainsworth* for the children.

LENK, J. The appellant is a member of the Wampanoag tribe and the biological father of three children who are the subject of a parental rights termination proceeding brought pursuant to G. L. c. 210, § 3. His tribal affiliation implicated the Indian Child Welfare Act, 25 U.S.C. §§ 1901 et seq. (1994), in the State court termination proceeding. On appeal, the father asserts error in four respects: (1) the tribe did not receive timely notice of the proceedings in violation of 25 U.S.C. § 1912; (2) certain subsidiary findings of fact were clearly erroneous; (3) the trial judge erroneously admitted hearsay statements alleging sexual abuse by the father; and (4) the evidence is insufficient to meet the heightened standard for termination of parental rights set forth in 25 U.S.C. § 1912. We affirm.

*Facts.* After hearing ten days of testimony in the period from February to June of 1998, and receiving in evidence fifty-two exhibits, the judge made well over two hundred subsidiary findings of fact which we now summarize. The appellant and his wife had four children in their care, three from their marriage and one from a former relationship by the wife. The Department of Social Services (DSS) filed a petition on November 22, 1993, pursuant to G. L. c. 210, § 3, to dispense with the need for parental consent to the adoption of the four boys. The mother was a party to the proceedings until she withdrew her objections on the fourth day of trial; her son Alex from a previous relationship is accordingly not a subject of this appeal.

The events leading up to the termination of the father's parental rights began in April, 1990, almost nine years before trial began, when the police were called to the family's home in response to a complaint of domestic violence. Two police officers and a DSS social worker testified at trial to the filthy conditions in the home and the flea bites and scratches on the three older boys. (Brian, the youngest, would not be born until 1991.) At this time Alex was four, Arnold was almost two years old, and Jake was eight months old. A G. L. c. 119, § 51A, report alleging neglect and emotional maltreatment was filed and supported, and DSS obtained temporary custody of the boys, but did not remove them from the home. Ten days later another § 51A report was filed alleging that four year old Alex had cigarette burns on the palm of his hand.

DSS social worker Carol Murphy was assigned to the case to address issues of domestic violence, the family's living conditions, and neglect of the children. She learned in August, 1990, that the home was without electricity, gas, or hot water. The following month, the father would not allow her into the home. In October, DSS filed a care and protection petition pursuant to G. L. c. 119, § 24, and was awarded temporary custody of the three children. The oldest boy thanked the social worker who removed him from his parents' care. In that same month, a § 51A report was filed, alleging that the mother's niece, who babysat for Alex, had sexually abused him, and that, notwithstanding the mother's knowledge of the abuse, the mother permitted the niece in the family home.

During her two and one-half year tenure on the case, Murphy prepared four service plans, the fourth remaining unsigned by the father; the aim of those plans was family reunification. The trial judge found that lack of compliance with the plans, including repeated failure on the father's part to meet with a parent aide and to attend counseling and undergo a substance abuse evaluation, prevented the return of the children. Supervised visitations occurred at least monthly in this period and often caused the children extreme anxiety. In 1991, the children spent overnight unsupervised visits with the parents. On occasion Jake returned to foster care with diaper rash, once bleeding from the groin area, and once with a black eye. Arnold returned to foster care on one occasion wearing a urine soaked shirt. By June, 1991, however, compliance with the service plans had increased sufficiently to allow the children's return to their parents.

The youngest son, Brian, was born shortly after the other children returned home. For the next several months, Murphy continued to visit the home and soon discovered it in much the same condition as had first occasioned the children's removal. The home was filthy, broken pipes in November, 1991, had caused a partial flood, and the electricity was off again. The trial judge credited Murphy's testimony that the father had diverted money designated to provide necessities for the newborn baby to buy a television antenna. The baby, Brian, was frequently found sitting in a car seat at home, which flattened a portion of his head and caused significant deterioration of his ability to use his left arm, a condition later rectified only after a year of daily therapy by his foster parents.

In December, 1991, and January, 1992, the home was again without utilities. In January, the police were again summoned to the home when the father became enraged, held a gun to a friend's head, and threatened to "ice" him in the children's presence, an incident for which the father later served time in prison. Two days after this incident, the mother obtained a restraining order against the father. The children were placed in foster care a second time that same month and, except for Brian who would return briefly in the spring of 1992, have not since returned to their biological parents.

Brian entered foster care "not smelling like a baby" in the words of his foster father. He had severe cradle cap, diaper rash, and his penis was covered with a white crust. He was emaciated, but at first only wanted to drink water. When he did eat, it seemed as if he had been starving. Both Alex and Jake later disclosed that their father had sexually abused them. They made these disclosures to several therapists after they manifested certain aggressive and sexualized behaviors requiring evaluation.

Arnold and Jake have been diagnosed as suffering from, among other things, posttraumatic stress disorder, which the trial judge found to be the result of the father's treatment of them. The father declined to take any responsibility for the children's severe psychological disturbances and consistently refused to follow the service plan mandates that he attend counseling and participate in both sexual and substance abuse evaluations. Indeed, upon being approached by a DSS investigator regarding Alex's disclosures of sexual abuse, the father attempted to explain away Alex's sexualized behavior.

The judge found that the father had exhibited minimal interest in the welfare of his children in the five years between their entry into foster care and the beginning of trial. Each of the numerous social workers handling the case in that time period testified that the father never inquired as to the children's welfare and never sent them cards or gifts. His contact with DSS was minimal, as was his compliance with service plans. The counseling he did attend was a requirement of his probation, and it neither addressed parenting or sexual abuse issues nor caused the father to face the extreme trauma his children had experienced at his hands.

Therapists for the three younger children testified that any contact with their father would be detrimental to them. The psychiatrist treating Arnold and Jake opined that, were the boys

to be returned to their father's care, their symptoms of posttraumatic stress disorder would worsen and likely later entail multiple personality disorder, suicidal and homicidal tendencies, and a variety of other psychological disturbances. In sum, they would likely not become functional adults if returned to their father. The psychiatrist recounted that Arnold and Jake had spoken to him of their fear of their father as well as of their feelings of wanting nothing to do with him. Brian's psychiatrist conducted an attachment assessment of him to gauge the likely effect of removal from his foster family, the only family he remembers. He opined that Brian was strongly attached to his foster parents and that removal from them would be devastating, increasing the probability that he would be subject to major depression or other psychological disturbances as he approached adolescence.

On the basis of these subsidiary findings, the judge made ultimate findings that the father was currently unfit to parent his three children and that the children's best interests require that they not have any contact with their father. The judge also specifically found that the evidence supported a determination beyond a reasonable doubt that continued custody of the children by the father would likely result in serious emotional or physical damage to the children. The father's right to receive notice or to consent to the adoption of his children was accordingly terminated.

*Analysis.* Before turning to the four specific issues that the father raises on appeal, we observe that this case presents us for the first time with a parental rights termination proceeding governed by the Indian Child Welfare Act (ICWA) enacted in 1978. 25 U.S.C. §§ 1901 et seq. The ICWA was enacted in response to an alarming number of instances where the rights of Indian parents to their children were terminated and their children were adopted into non-Indian homes. 25 U.S.C. § 1901. In *Mississippi Choctaw Indian Band* v. *Holyfield*, 490 U.S. 30, 32-36 (1989), the Supreme Court recounted Congressional findings as to the shortcomings of State laws applicable to termination proceedings. Congress found that such laws are often blind to the cultural differences inherent in Indian family and tribal life[2] and to the particular interest Indian tribes have in ensuring that Indian children grow up in those tribes. *Id.* at 34-

---

[2]One illustration of a cultural misconception with often drastic consequences concerns the predominant perception that the nuclear family is the proper

36. 25 U.S.C. § 1901(3)-(5). Not only were there an alarming number of unwarranted parental rights terminations, but even in those instances where terminations were warranted, State law required no effort to place the Indian child in an Indian family. The cultural biases leading to unwarranted terminations of parental rights, when coupled with the failure to recognize the crucial interest that tribes have in the placement of Indian children within their tribes, threatened continuing tribal viability. The ICWA was the legislative response.

To counter the unwarranted removal of children, the ICWA provides in pertinent part that, "[n]o termination of parental rights may be ordered in [a parental rights termination] proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). When termination is warranted, the ICWA requires that preference "be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a). The act thus serves to protect not only the interests of the child and the parents, but of the tribe as a whole. 25 U.S.C. § 1902.

Congress empowered tribal courts to accomplish these goals, thereby creating a dual jurisdictional framework which balances tribal and State court authority. 25 U.S.C. § 1911. If a child is domiciled on a reservation, the tribe has exclusive jurisdiction over child custody proceedings. 25 U.S.C. § 1911(a). If a child is not domiciled on a reservation, then State and tribal courts have concurrent jurisdiction, and a State court is required to notify the tribe if it has reason to believe that the custody proceedings involve an Indian child. 25 U.S.C. § 1912(a). The tribe may choose to intervene in the State court proceeding at any time. 25 U.S.C. § 1911(c). Jurisdiction will remain in State court if the tribe or either parent declines tribal jurisdiction, but

locus for child rearing. *Mississippi Choctaw Indian Band* v. *Holyfield*, 490 U.S. at 34-35. This is untrue in some Indian cultures which may include "perhaps more than a hundred relatives who are counted as close, responsible members of the family." *Id.* at 35 n.4. Social workers unaware of their bias in this respect might infer neglect if a child was found in the care of those outside the nuclear family. *Ibid.*

the State court may also decline to transfer the proceedings to tribal court if it finds "good cause" not to do so. 25 U.S.C. § 1911(b).

The father asserts in this appeal that (1) the tribe did not receive timely notice of the proceedings in violation of 25 U.S.C. § 1912(a); (2) six subsidiary findings of fact were clearly erroneous; (3) the judge erroneously admitted hearsay statements alleging sexual abuse by the father; and (4) the evidence is insufficient to meet the heightened standard for termination set forth in 25 U.S.C. § 1912(f). We address each of the father's arguments in turn.

1. *Notice to the tribe.* The father contends that the tribe did not receive timely notice in compliance with the requirements of 25 U.S.C. § 1912(a). Section 1912 requires that, in any involuntary State court proceeding, such as this termination proceeding under G. L. c. 210, § 3, and care and protection proceedings under G. L. c. 119, § 24, "the party seeking the foster placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912(a). Although the tribe was notified in 1995 of the termination proceedings commenced that year, the father maintains that the tribe should have been notified prior to the earlier 1990 care and protection proceedings. While not plainly articulated in his brief, we surmise that the father contends in this regard that the initial lack of notice somehow deprived the State court of jurisdiction over the later termination proceedings.[3]

The provisions of the ICWA applicable to involuntary proceedings for foster care placement or termination of parental rights are triggered when the court "knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a). There is no authority directly on point, but we think that *State*

_____

[3]As noted, the ICWA gives presumptive jurisdiction to the tribe unless either parent contests it, the tribe refuses jurisdiction, or the court finds "good cause" to keep the proceedings in State court. Although the record is not particularly revealing on this issue, an agreement pursuant to 25 U.S.C. § 1919(a), applicable to this case, was apparently entered into between the Wampanoag tribe and the Commonwealth as to State court jurisdiction. In any event, other than the limited argument raised concerning notice, the father does not dispute that proper jurisdiction for these proceedings was in the State court.

*ex rel Juvenile Dept.* v. *Tuker,* 76 Or. App. 673 (1985), is instructive. There, the mother argued that, because her Alaskan ancestral village was not notified of certain foster care placement proceedings, which predated by two years the later termination proceedings, the foster care placement should be invalidated. At the time of the earlier proceedings, the trial court judge had inquired as to the child's eligibility for tribal membership but was provided by the Federal Bureau of Indian Affairs with information, later determined to be incorrect, that the child was not eligible for tribal membership. *Id.* at 678-679. Two years later, when the trial court became aware of the error, it undertook compliance with ICWA requirements. *Id.* at 679. The reviewing court declined to invalidate the foster care proceedings because the trial court judge neither knew nor had reason to know at the earlier date that the child was Indian for the purposes of the act and its provisions were accordingly not triggered at the time. *Id.* at 681.

The record before us similarly supports the conclusion that, at all times before the 1990 care and protection proceeding until the time in 1995 that the tribe received notice, neither the court nor DSS knew or had reason to know that the children were Indian. The record contains a child abuse and neglect report form from April 4, 1990, designating the children and mother as "Cauc" (which we take to mean Caucasian) and the father as "Hispanic." In another report prepared as late as January 7, 1993, the children are again identified as "Cauc." An attorney for the tribe filed a motion to intervene on December 15, 1995, and was permitted to participate fully in the trial. Even if we were to assume without deciding that a lack of jurisdiction in earlier proceedings might in some circumstances fatally affect subsequent proceedings, the evidence before us is clear that earlier notice was unwarranted. There was no error.

2. *Error in factual findings.* The father next contends that six of the judge's subsidiary findings are clearly erroneous because they are not supported by the evidence. On appeal, we review the evidence to determine if it adequately supports the judge's subsidiary findings of fact. *Commonwealth* v. *McGrath,* 361 Mass. 431, 438 (1972). It was the trial judge who had the opportunity to see and hear the witnesses, and it is for him and not for us to assess their credibility and to weigh the evidence presented. Only if there is clear error will we disturb those findings. See Mass.R.Civ.P. 52(a), 365 Mass. 816-817 (1974);

*Adoption of Karla*, 46 Mass. App. Ct. 64, 66 (1990) (though the Massachusetts Rules of Civil Procedure do not apply to petitions to dispense with consent to adoption, by analogy we look to certain rules as providing cogent standards). Notwithstanding the heightened burden of proof imposed by the ICWA as to the ultimate finding concerning whether returning the children to their father's care would likely cause them to suffer serious physical or emotional damage, this standard does not apply to each individual piece of evidence supporting the subsidiary findings. See *Commonwealth* v. *Truong*, 34 Mass. App. Ct. 668, 672 (1993). We have examined the record and conclude that it fully supports the challenged findings.[4]

3. *Hearsay statements.* The father argues that the trial judge erred in admitting in evidence, pursuant to G. L. c. 233, § 82, certain hearsay statements. The graphic statements in question were made by Alex and Jake and disclosed sexual abuse by the father. Alex first made disclosures during a SAIN (Sexual Abuse Intervention Network) interview on February 14, 1992,[5] and then during a psychological evaluation by Dr. Hall, a psychologist, in March, 1993.[6] Jake's statements were made on three occasions: first, during an emergency evaluation conducted by a

---

[4]We address each of the father's challenged findings in turn. (1) DSS social worker Murphy testified that there was very little interaction between the children and the parents during supervised visits, supporting the finding to that effect. (2) A psychiatrist who evaluated Alex provided support for the finding that Alex identified the father as his sexual abuser. (3) A DSS supervisor's testimony provided support for the finding that the supervisor sent a service plan to the father. (4) The father misconstrues the finding that the father did not contact DSS after being contacted. That finding, taken in context, serves to indicate that the father failed to contact DSS within a certain time frame, a fact fully supported by the record. (5) A psychiatrist testified that he established Jake's credibility and the trial judge credited that testimony thereby providing support for the finding to that effect. (6) Also credited by the trial judge was the psychiatrist's testimony that Jake could distinguish truth from falsehoods, providing support for that contested finding.

[5]On this first occasion, Alex stated, "kiss my peanut," "kiss my ass," and "he's heavy." Alex responded "no" when asked if daddy had clothes on. Alex indicated he was touched on his penis by daddy's hands, and he was kissed on his penis by daddy. Alex also stated he was made to sit on daddy's penis, which he described as "bigger." Alex described the penis as "big, strong and, hard." He stated that he kissed the father's penis and "I ate it too," "it was pink, tastes like pee, it was gross."

[6]When asked to draw a picture of his biological family Alex said, "No way Jose." Alex further stated that "I don't know where my f-ing, freaking mother is"; "I hate them"; "They done it on purpose"; "It was not my fault"; and

social worker on April 17, 1993[7]; second, to a DSS investigator on April 27, 1993,[8] and third, to his psychiatrist on April 26, 1993.[9]

General Laws c. 233, § 82, "strikes a balance between the parents' due process right to rebut evidence and the State's need to protect children." *Adoption of Quentin*, 424 Mass. 882, 892 (1997). The procedures outlined in *Commonwealth* v. *Colin*, 419 Mass. 54 (1994), and approved of in *Adoption of Quentin*, *supra* at 893, are intended to assure that this balance will be struck whenever a judge considers whether to admit the hearsay statements of children pursuant to G. L. c. 233, § 82. These procedures include (1) giving prior notice to the party against whom such statements will be used; (2) showing by more than a mere preponderance of the evidence a compelling need for use of the hearsay statements; (3) conducting any necessary separate hearings on the record regarding the reliability of a child witness's out-of-court statements and issuing specific findings which present the basis upon which the reliability of the statements was determined; and (4) requiring independently admitted evidence that corroborates the out-of-court statement. *Ibid.*

The judge admitted de bene Alex's and Jake's hearsay statements. Before the close of trial, he issued the required written findings as to the witnesses' unavailability, the reliability of the statements, and the existence of corroborating evidence, thereby satisfying the requirements under G. L. c. 233, § 82, for admission of the statements into evidence. See *Adoption of*

"I'll show you." Dr. Hall testified that Alex grabbed the picture and made a rubbing movement on the genital area. When asked to identify the perpetrators, Alex stated, "Daddy and Momma."

[7]Jake initiated conversation of sexual abuse. He stated that he had been touched on his "dink" (previously identified as his penis). He indicated that his mother and father had hurt his "dink." He stated that his daddy "eats [his] dink," "hurt [his] dink," and "eats my dink." Jake pointed to the anatomically correct doll and said that daddy hurt his "dink" with his mouth.

[8]When the investigator began to question Jake about the sexual abuse, he immediately started to pull at his penis. When she asked whether Jake knew what a bad touch was he stated, "yes, when mommy bites my dink hard." When she asked if he knew what a good touch was, Jake stated, "yes, when mommy and daddy bite my dink softly."

[9]Jake stated to the psychiatrist that the "good monster did something to [his] dink," and that "the monster bit and ate [his] dink." Initially Jake denied it was his parents, but at a later interview identified his father as the perpetrator of the abuse.

*Quentin, supra* at 892 n.6. The father challenges those findings only as they concern the reliability of the witnesses and the existence of corroborating evidence, and we review them for an abuse of discretion. See *Commonwealth* v. *Colin,* 419 Mass. at 65; *Adoption of Quentin, supra* at 892-893.

The judge found that both of Alex's interviewers had established the credibility of his statements by ascertaining whether Alex understood the distinction between truth telling and lying and that he made the statements in a controlled and comfortable setting. Alex made the disclosures of sexual abuse spontaneously in the absence of questioning or prodding by the interviewers and he made them multiple times. The judge also found that Alex had developed a comfortable and trusting relationship with one of the interviewers. See *Adoption of Kimberly,* 414 Mass. 526, 533 n.15 (1993). The evidence corroborating Alex's disclosures included certain observed behaviors (anxiety, aggression, night terrors, masturbation, and sexualized behavior including grabbing his foster mother's breasts).

The judge found that, during three interviews, Jake was able to distinguish between truth telling and lying. The father challenged the reliability of the disclosures made in Jake's first interview with a social worker who used anatomically correct dolls, by eliciting testimony from several witnesses that some uses of anatomically correct dolls may induce children to make false disclosures of sexual abuse. The judge, however, specifically found that the social worker "exercised great care and caution with the use of anatomically correct dolls . . . . [I]t was only upon Jake's initiative that the anatomically correct dolls became a part of the evaluation, and [the social worker] allowed their use only to assist Jake with the description of what occurred," a finding amply supported by the record. Compare *Adoption of Stuart,* 39 Mass. App. Ct. 380, 389-390 n.15 (1995). The corroborative evidence was once again observed behaviors.[10]

We discern no basis in the record before us to suggest that

---

[10]During Jake's sessions with the psychiatrist, he would pull on his penis repeatedly and would need to urinate once or twice during the hour. In one session he urinated on the floor. His behavior was very aggressive, destructive, and self-injurious. He had issues related to food consumption and mood; he was emotionally unstable, had an unusual interest in sex and genitalia, and engaged in simulated sex play. The trial judge found these symptoms to be strong corroborative evidence of the reliability of Jake's disclosures.

the judge abused his discretion in admitting the challenged statements.

4. *Sufficiency of the evidence.* Last, the father contends that the evidence was insufficient to support termination of his parental rights. As we have stated, under the ICWA, "[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). Where, as here, the children have not been in their parent's custody for several years, the relevant inquiry is whether their return to that parent is likely to result in serious emotional or physical damage. See *In re Welfare of W.R.*, 379 N.W.2d 544, 546, 548 (Minn. Ct. App. 1985). The judge's determination that the evidence was sufficient to support this conclusion beyond a reasonable doubt is a question of law subject to review by this court. See *Commonwealth* v. *Belle Isle*, 44 Mass. App. Ct. 226, 229 (1998).

The Federal Bureau of Indian Affairs (BIA) has promulgated guidelines to assist State courts in interpreting the ICWA. See 44 Fed. Reg. 67,584-67,595 (1979). These nonbinding but instructive guidelines indicate that, because many unwarranted removals of Indian children are attributable to cultural bias on the part of those making the decisions, the "focus [in terminating parental rights] must be on whether the particular conditions are likely to cause serious damage." 44 Fed. Reg. 67,593.

Here, the judge concluded that termination was warranted because of evidence supporting beyond a reasonable doubt that the children would likely suffer serious physical or emotional damage if returned to their father's care. He based this conclusion in large part on the evidence before him that all three children had suffered severe neglect and physical abuse, sexual and otherwise, at the hands of their father. At the time of trial, Arnold and Jake suffered from posttraumatic stress disorder attributable to their father's treatment of them. We perceive no risk that termination based on these factors is attributable to cultural bias and all that we need consider is whether the trial judge's conclusion is supported by evidence beyond a reasonable doubt. Proof beyond a reasonable doubt "is a term often used, probably pretty well understood, but not easily defined . . . . For it is not sufficient to establish a probability, though a

strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it." *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

The trial judge found that the children had suffered considerable abuse attributable to their father, which we have earlier summarized. Further, the father had disclaimed responsibility for his children's conditions and had declined services that might have addressed his abusive behavior. Prior efforts to reunify the family were futile: the children were again subjected to neglect and abuse and were returned to foster care. The children's psychiatrists opined as to the likely damage the boys would suffer were they to have any further care from their father. Absent reliance upon any factor reflecting impermissible cultural bias and given the plethora of evidence as to the father's affirmative abuse of his sons and his failure to reform, we discern no error in the judge's determination that the evidence established beyond a reasonable doubt that the children's return to their father would likely result in severe emotional or physical damage.[11]

*Decrees affirmed.*

---

[11]The ICWA also provides for preference for the placement of Indian children with Indian families. The representative from the tribe testified at trial that inquiries were made to find Indian adoptive parents, but to no avail. The father does not contest the placements for the children.