Argued and submitted July 11, affirmed on appeal and cross-appeal
October 17, 2001

In the Matter of
Selana Lee Lucas, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES
and Selana Lee Lucas,
*Respondents - Cross-Respondents,*

*and*

CONFEDERATED TRIBES OF SILETZ INDIANS,
*Respondent - Cross-Appellant,*

*v.*

Aimee Elizabeth LUCAS,
*Appellant - Cross-Respondent.*

J980891; A112136 (Control)

In the Matter of
Monica Ray Lucas, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES
and Monica Ray Lucas,
*Respondents - Cross-Respondents,*

*and*

CONFEDERATED TRIBES OF SILETZ INDIANS,
*Respondent - Cross-Appellant,*

*v.*

Aimee Elizabeth LUCAS,
*Appellant - Cross-Respondent.*

J980892; A112137

In the Matter of
Eleezia Nicholl Lucas-Mata, a Minor Child.

STATE ex rel STATE OFFICE FOR
SERVICES TO CHILDREN AND FAMILIES
and Eleezia Nicholl Lucas-Mata,
*Respondents - Cross-Respondents,*

*and*

# CONFEDERATED TRIBES OF SILETZ INDIANS,
*Respondent - Cross-Appellant,*

*v.*

## Aimee Elizabeth LUCAS,
*Appellant - Cross-Respondent.*

### J980893; A112138 (Cases Consolidated)

33 P3d 1001

Liza J. Langford argued the cause and filed the brief for appellant - cross-respondent.

Craig J. Dorsay argued the cause and filed the brief for respondent - cross-appellant Confederated Tribes of Siletz Indians.

Daniel J. Casey, Assistant Attorney General, argued the cause for respondent - cross-respondent State Office for Services to Children and Families. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Phillip T. Wiseman argued the cause and filed the brief for respondents - cross-respondents Selana Lee Lucas, Monica Ray Lucas and Eleezia Nicholl Lucas-Mata.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

**KISTLER, J.**

Mother appeals from a judgment terminating her parental rights to her three children pursuant to ORS 419B.500 *et seq.* and the Indian Child Welfare Act (ICWA), 25 USC § 1901 *et seq.* The Confederated Tribes of Siletz Indians cross-appeals, raising issues that parallel those mother raises on appeal. On *de novo* review, we affirm on the appeal and on the cross-appeal.

Mother is an enrolled member of the Siletz Indian Tribe. She has four children, the three oldest of whom are the subjects of this case.[1] The children were born April 13, 1994, June 8, 1996, and September 9, 1998. They are "Indian children" within the meaning of ICWA.

The State Office for Services for Children and Families (SCF) had its first contact with the family in August 1994, when the office received a report that mother was neglecting her eldest, and at that time her only, child. Within the next four years, SCF had six more contacts with the family, all resulting from reports of drug use, neglect, and physical abuse. The last referral was the result of the youngest child testing positive for methamphetamine when born. All three children were taken into protective custody at that time. After an initial hearing in September 1998, the children were placed in foster homes and have remained there since. Shortly after the first hearing, the tribe intervened in the proceedings pursuant to ICWA.

In October 1999, SCF filed petitions to terminate mother's parental rights to all three children. The petition alleged that mother was unfit due to criminal conduct, addiction, failure to obtain suitable housing, emotional abuse, physical neglect, and failure to present a viable plan for the return of the children. The petition further alleged that, pursuant to ICWA, SCF had made active efforts to provide remedial services and rehabilitative programs to prevent the

---

[1] The father of the eldest child remains the legal father. The father of the middle child signed a voluntary relinquishment of his rights, and the father of the youngest child had his rights terminated.

break-up of the family but that those efforts had proved unsuccessful. The case went to trial in December 1999.[2]

At trial, numerous witnesses testified about mother's drug addiction, her poor parenting skills, and the prognosis for the child who was born drug affected. The testimony established that mother has been addicted to methamphetamine since the age of 13. Both the tribe and SCF offered mother a range of services and drug counseling, but mother failed to follow through with treatment for any significant period of time. There were numerous instances in which mother promised to go to drug treatment but did not go or in which mother attended drug treatment for a brief time but left before the end of the program. Shortly before the trial began, mother entered another rehabilitation program. Although she ultimately transferred to a longer-term program, she left against medical advice after six days. Finally, mother admitted that she used methamphetamine while pregnant with her fourth child.

In December 1998, mother was arrested for shoplifting and drug possession. A similar arrest followed in August 1999, when mother shoplifted merchandise to exchange for drugs. She later spent time in jail for those crimes. During the pendency of these proceedings, mother moved eight times, and there were several periods of time when SCF did not know where she was living. Mother signed two visitation agreements, granting her visits with her children under an agreed-upon schedule. However, mother failed to fulfill her portion of the visitation agreements, missing many of the scheduled visits.

Medical professionals testified that, as a drug-affected baby, the youngest child suffered withdrawal symptoms, quit breathing on one occasion, suffered recurring ear infections, and was constantly irritable. When the two older children arrived in foster care, they had dirty faces and ears, had not been bathed for days, their teeth were rotted, and their gums were diseased.

---

[2] The trial consisted of five separate hearings: December 20, 1999; February 14, 2000; March 17, 2000; May 8, 2000; and September 18, 2000.

In April 2000, after the majority of the trial had been completed, the tribe filed a motion to transfer jurisdiction of the case to the tribal court. Mother also moved to dismiss all petitions to terminate her parental rights because the state had failed to present the testimony of a qualified expert witness as required under ICWA. The trial court denied both motions and terminated mother's rights to all three children.

■    On appeal, mother and the tribe raise multiple assignments of error. We write only to address their arguments that the trial court erred in denying the motions to transfer jurisdiction and to dismiss the petitions to terminate her parental rights because SCF failed to present the testimony of a qualified expert witness. We have considered the other rulings to which mother and the tribe assign error and affirm them without discussion.

Midway through the trial, the tribe filed a motion to transfer jurisdiction over the two older children to the tribe.[3] Neither mother nor the state opposed the motion. However, the trial court denied the motion because it was filed too late in the proceedings and because it was not in the best interests of the children. Mother and the tribe assign error to that ruling. They argue that, pursuant to ICWA, the decision to deny a transfer of jurisdiction must be based on good cause, which was lacking in this case. The state responds that the trial court correctly denied the motion because the tribe's petition was filed too late.

Section 1911(b) of ICWA provides:

"In any State court proceeding for the * * * termination of parental rights to * * * an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, *in the absence of good cause to the contrary*, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe[.]"

---

[3] The tribe orally moved to transfer jurisdiction on February 28, 2000. It filed a motion to transfer jurisdiction on April 3, 2000. The tribe did not request jurisdiction over the youngest child.

25 USC § 1911(b) (emphasis added); *see also* ORS 419B.100(6)(b) (implementing ICWA). ICWA does not define "good cause." However, the Bureau of Indian Affairs (BIA) has promulgated guidelines that set forth circumstances that may constitute good cause. One of those circumstances is that "[t]he proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing."[4] 44 Fed Reg 67591 (1979). The commentary to the guidelines notes that "[w]hen a party who could have petitioned earlier waits until the case is almost complete to ask that it be transferred to another court and retried, good cause exists to deny the request." *Id.* at 67590. As the commentary explains, last-minute transfers have a disruptive effect on the adjudicative process. *See id.*

■  In this case, the tribe received notice of the dependency action and intervened in October 1998. It did not request a transfer of jurisdiction until April 2000, 18 months after first receiving notice. The request was made between the third and the fourth hearing, approximately four months into the trial, when nearly all the evidence had been heard. We agree with the BIA guidelines that late requests for a transfer constitute good cause for denying the request. *See Kerotest Manufacturing v. C.O. Two Fire Equipment Co.*, 342 US 180, 183, 72 S Ct 219, 96 L Ed 200 (1952) (recognizing the need to give due "regard to conservation of judicial resources and comprehensive disposition of litigation" in ruling on similar motions). Other jurisdictions have held that a similar delay in requesting a transfer constitutes good cause to deny it. *See, e.g., Matter of Wayne R.N.*, 107 NM 341, 343-44, 757 P2d 1333, 1335-36 (1988) (upholding denial of request to transfer that was made on the morning of trial, six months after the tribe was served with notice); *In the Interest of J.W.*, 528 NW2d 657, 660 (Iowa App 1995) (upholding denial of request to transfer because the case was at an advanced stage and petition to transfer was not filed until seven months after tribe received notice); *Matter of Dependency and Neglect of A.L.*, 442 NW2d 233, 237 (SD 1989) (upholding

---

[4] Although we have declined to adopt the BIA guidelines, we have recognized that they may be instructive. *See State ex rel Juv. Dept. v. Charles*, 70 Or App 10, 17 n 3, 688 P2d 1354 (1984), *rev dismissed* 299 Or 341 (1985).

denial of request to transfer due to the untimeliness of the petition, filed approximately one year after tribe received notice). We hold that good cause existed to deny the motion to transfer jurisdiction to the tribe.

■     Mother and the tribe also assign error to the trial court's denial of her motion to dismiss the petitions. They argue that the state failed to fulfill its requirement under ICWA to produce a qualified expert witness to testify that mother's continued custody of the children posed a risk of emotional or physical harm to them. The state responds that a number of witnesses satisfied this requirement. Before turning to the parties' arguments, it is helpful to clarify the governing standard.

Section 1912(f) of ICWA provides:

> "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of *qualified expert witnesses*, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

25 USC § 1912(f) (emphasis added). *See also* ORS 419B.521(4) (implementing ICWA). The question whether the state has complied with the expert witness requirement of section 1912(f) presents two separate issues. The first is what qualifications must an expert witness possess. The second is what sort of testimony must the expert provide to comply with the statute.

■     On the first issue, the BIA has promulgated nonbinding guidelines. According to those guidelines, the witnesses who are most likely to meet the requirements for a qualified expert witness are:

> "(i)   A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices[; or]

> "(ii)  A lay expert having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards

and childrearing practices within the Indian child's tribe[; or]

"(iii)   A professional person having substantial education and experience in the area of his or her specialty."

44 Fed Reg 67593.[5] We have found those guidelines instructive in answering the first question—what qualifications must an expert possess. *See State ex rel SCF v. Amador*, 176 Or App 237, 242-43, 30 P3d 1223 (2001).

The text of section 1912(f) provides the answer to the second question—what sort of testimony must the expert provide to comply with ICWA. *See Oregon Department of Revenue v. ACF Industries, Inc.*, 510 US 332, 339-46, 114 S Ct 843, 127 L Ed 2d 165 (1994) (in interpreting federal statutes, the first step is to examine the statute's text and structure and then, if necessary, its legislative history). Before a court may terminate parental rights under ICWA, it must determine "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 USC § 1912(f). The court's determination must be "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses." *Id.* The expert need not express a conclusion on the ultimate question that the trial court must decide. Rather, under the plain language of the statute, it is sufficient if the expert's testimony supports the court's determination that continued custody is likely to result in serious emotional or physical damage to the child. *Id.* As explained below, the state produced numerous witnesses capable of satisfying those requirements.

At trial, Dr. Robyn Blair, a psychologist who specializes in chemical dependency, testified about the psychological evaluation she performed on mother. Blair's education and experience in clinical psychology date back 15 years. Blair's primary diagnosis of mother was addiction. She believed that, while mother alone had a good prognosis for recovery if she stayed in a structured, rigid program, the

---

[5] Where cultural bias is not implicated, the expert witness need not possess special knowledge of Indian life. *State ex rel Juv. Dept. v. Tucker*, 76 Or App 673, 683, 710 P2d 793 (1985), *rev den* 300 Or 605 (1986). Both parties concede that this case is not one involving cultural bias.

prognosis would drop significantly if mother regained custody of her children. Blair testified that mother's risk of relapse would be high if she were left to care for a drug-addicted baby. Blair stated that the best prognosis would be for mother to deal with the baby whom mother was carrying at the time of trial (and who is not the subject of this proceeding), and that baby only. Blair determined that mother did not have the parenting skills to parent the youngest child, who has extensive needs.

The youngest child's pediatrician, Dr. Sudha Chandrasekhar, has approximately 11 years of pediatric medical experience. Chandrasekhar testified that child would potentially be at risk of being abused if she went back to an environment where mother was using drugs. Moreover, when told that mother had been using drugs during her fourth pregnancy, Chandrasekhar testified that an environment where there was drug use was the least appropriate environment to which to return child. The physician also testified that child was going to need an environment where someone pays very close attention to her.

Maryann Scheck also testified at the trial. Until her retirement, Scheck had been a nurse for 39 years and had worked in outpatient drug treatment programs for 23 years. She testified that, given the length of time mother has used drugs, the young age at which she started, and the short time she has been in treatment, mother has a "very guarded prognosis." She stated that mother's chance of recovery is highest when she is responsible only for herself. Scheck also testified that mother's recovery would likely take one to two years.

Frank Petersen, a former Indian Child Welfare Family Advocate for the Siletz tribe, testified as well. His testimony established that he had worked for the tribe for 18 years as a drug and alcohol counselor, programs manager, and family advocate. He is recognized by the tribe as being knowledgeable in tribal customs, including knowledge of social and cultural standards relating to child rearing practices within the tribe. Petersen testified that mother's behavior as a parent is not culturally appropriate within the Siletz tribe. If the neglect and drug addiction issues had arisen while the children lived on the reservation, Petersen believed

that the tribe would have taken the children into protective custody. He stated that both the tribe and the state had offered remedial services but that mother did not take advantage of them. He believed that mother had not demonstrated culturally appropriate parenting in rearing the children and, as a result of her parenting, the children had suffered adversely. In his words, mother "has not acted in the best interests of these children."

In light of the evidence, mother's argument that there were no qualified expert witnesses fails. Blair, Chandrasekhar, and Scheck are all professionals having substantial education and experience in their areas of specialty. Each gave testimony that supported the trial court's determination that mother would likely continue to cause her children serious harm if she were to regain custody. Moreover, Petersen is an expert who has substantial experience in the delivery of child and family services to Indians. The tribe acknowledges that he has extensive knowledge of prevailing social and cultural standards and childrearing practices within the tribe. Like the other witnesses, his testimony supported the determination that mother's continued custody would cause the children physical and emotional harm. The record included "qualified expert testimony," as required by ICWA, that supports the termination of mother's parental rights.

Affirmed on appeal and cross-appeal.