207 P.3d 423 (2009)
228 Or. App. 70
In the Matter of K.L.D., K.I.D., and T.D.D., Minor Children.
DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
K.C.J., Appellant.
0500664, 0500665, 0500666; Petition Numbers 07JU380TPR, A139884.
Court of Appeals of Oregon.
Argued and submitted on January 28, 2009.
Decided April 29, 2009.
*424 Holly Telerant, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.
Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were John Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
LANDAU, P.J.
This is a termination of parental rights case governed by the Indian Child Welfare Act (ICWA). The trial court terminated father's parental rights after finding that he suffers from significant cognitive defects that are not likely to change and that he had severely and chronically neglected the children.[1] On appeal, father contends that the court erred for three reasons: (1) the Department of Human Services (DHS) failed to prove his parental unfitness beyond a reasonable doubt; (2) the testimony of DHS's "qualified expert witness" did not establish beyond a reasonable doubt that returning the children to father is "likely to result in serious emotional or physical damage" to them; and (3) DHS failed to make "active efforts" to reunite him with his children. We affirm.
We begin with a description of the applicable legal principles to properly frame the issues on appeal. To terminate parental rights on the ground of unfitness, ORS 419B.504 requires the court to determine whether the parent has engaged in conduct or is characterized by some condition that is seriously detrimental to the children. Among the criteria that the court must consider in determining fitness is the "failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." ORS 419B.504(5). If the parent is unfit, the court *425 must determine whether it is improbable that the child will, "within a reasonable time," ORS 419B.504, be reintegrated into the parent's home. State ex rel Dept. of Human Services v. Smith, 338 Or. 58, 80-81, 106 P.3d 627 (2005). The final inquiry is whether termination of parental rights is in the best interests of the child. ORS 419B.500; State ex rel Dept. of Human Services v. Cain, 210 Or.App. 237, 260, 150 P.3d 439 (2006), rev. den., 342 Or. 503, 155 P.3d 874 (2007). As to the standard of proof, "[t]he facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence." ORS 419B.521(1).
The parties agree that the three children at issue in this case qualify as Indian children under ICWA. 25 U.S.C. § 1903(4). ICWA does not relieve DHS of its obligation to prove a state law ground for the termination. See 25 U.S.C. § 1902 (stating the purpose of ICWA as, in part, to establish "minimum Federal standards for the removal of Indian children from their families"); Cain, 210 Or.App. at 239, 150 P.3d 439 ("The ICWA's requirements supplement and, where in conflict, displace state law governing the termination of parental rights to Indian children."); State ex rel. SOSCF v. Amador, 176 Or.App. 237, 243, 30 P.3d 1223, rev. den., 333 Or. 73, 36 P.3d 974 (2001) (same). ICWA does, however, impose additional procedural and substantive safeguards.
Two of those safeguards are relevant in this case. First, under ICWA, before a court may terminate parental rights, it must determine "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f); see also ORS 419B.521(4) (incorporating that standard into Oregon's juvenile code). That determination must be "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses." 25 U.S.C. § 1912(f). Such a witness "`must possess special knowledge of social and cultural aspects of Indian life.'" Amador, 176 Or.App. at 243, 30 P.3d 1223 (quoting State ex rel. Juv. Dept. v. Charles, 70 Or.App. 10, 17 n. 3, 688 P.2d 1354 (1984), rev. dismissed, 299 Or. 341, 701 P.2d 1052 (1985)). "Where cultural bias is not implicated," however, "the expert witness need not possess special knowledge of Indian life." State ex rel. SOSCF v. Lucas, 177 Or.App. 318, 326 n. 5, 33 P.3d 1001 (2001), rev. den., 333 Or. 567, 42 P.3d 1245 (2002); accord State ex rel. Juv. Dept. v. Tucker, 76 Or.App. 673, 683, 710 P.2d 793 (1985), rev. den., 300 Or. 605, 717 P.2d 1182 (1986). Nevertheless, an expert witness is still necessary, and the expert must testify as to whether serious emotional or physical damage to the child is likely to occur if the child remains in the custody of the parent and must have substantial expertise in his or her area of specialty, although "[t]he expert need not express a conclusion on the ultimate question that the trial court must decide." Lucas, 177 Or.App. at 326, 33 P.3d 1001. "Rather, * * * it is sufficient if the expert's testimony supports the court's determination * * *." Id. (emphasis added).
Second, ICWA requires DHS to "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); see also ORS 419B.498(2)(b)(C) (incorporating that standard into Oregon's juvenile code). "Active efforts" entails more than "reasonable efforts" and "impose[s] on the agency an obligation greater than simply creating a reunification plan and requiring the client to execute it independently." State ex rel. Juv. Dept. v. T.N., 226 Or.App. 121, 124, 203 P.3d 262 (2009) (elaborating that "[a]ctive effort means that the agency must assist the client through the steps of a reunification") (citing A.M. v. State, 945 P.2d 296, 306 (Alaska 1997)).
With the foregoing principles in mind, we turn to the facts of this case. At issue are father's parental rights as to three children, ages 2, 4, and 5 at the time of trial. Mother has a history of drug and alcohol problems, which led to deteriorating conditions in the home and, ultimately, to the involvement of DHS and the tribe. Father suffers from significant cognitive deficits, particularly in areas pertaining to social judgment, interpersonal problem-solving, and abstract reasoning. *426 He also suffers from what has been diagnosed as passive-dependent personality disorder, which leads him to blame others for problems and fail to take initiative. He also has a significant criminal history, including convictions for, among other things, forgery and theft.
At the time of the termination trial, DHS and the tribe had been providing a wide variety of services to the family for nearly six years. During that period of time, the family never emerged from "crisis mode." Also during that time, father was incarcerated for three months and committed further criminal activity after his release. The family experienced periods of homelessness as father struggled to secure meaningful employment.
Father and mother accepted the cash assistance provided by the tribe to pay rent and utilities and to purchase furniture and other necessities for the children, although they were reluctant to participate in other types of services. When father did participate, it was with little success. Father completed a parenting class, although the service workers involved with father did not believe that he had internalized the lessons. Given that his psychological evaluations disclosed borderline intellectual functioning, father's mental health services were intended to assist him in learning successful behaviors through eight or nine months of individual and group counseling. Father participated in only six weeks of counseling, however.
Meanwhile, the children suffered severe problems with tooth decay. Both father and mother were aware of the problems, but left them untreated. The tribe and DHS offered the family free medical and dental care. Even when the tribal representative who was working with the family and DHS set up the appointments for them, the children never received any care. In response to questions about the children's missed appointments, father placed all of the responsibility on mother, despite the fact that he expressed concerns about mother's ability to parent or supervise the children.
After nearly four years of providing services to the family, DHS removed the children from the parents' care after mother tested positive for methamphetamine at the hospital after giving birth to the youngest child. Father asserted that, although he knew that mother had a problem with alcohol, he was completely unaware of any drug problem. Once in substitute care, the two older children received significant dental work to remediate their severe tooth decay. In the case of the oldest child, some teeth had abscessed and may have caused damage to her permanent teeth.
A year after the children were removed, father and mother ended their relationship. Father continued to receive services for the next six months, including in-home services that would normally not be provided once the children had been removed. Father did not make sufficient progress, however, and DHS filed a termination petition.
Father then moved from Roseburg to Grants Pass, in an effort to be closer to his family and because he believed that he would have better employment opportunities there. Because father had difficulty securing transportation to attend visits with the children even when he lived in Roseburg, DHS discouraged father from moving an hour's drive away from his children. Father moved anyway. To assist father in continuing the required services in his new community, DHS provided him with a local "courtesy" caseworker. Although father met with her shortly after his relocation, and he had the information he needed to continue services, he failed to do so. The caseworker was unable to follow up with father because he did not provide her with his current contact information.
As expected, father also had difficulty attending visits with the children. Despite DHS providing him with bus passes, father attended only one visit after his move. He said that he could not afford to take the time off of work and blamed his lack of contact with his children on DHS. According to father, DHS should have brought the children to Grants Pass for the visits. DHS, in consultation with the tribe, had determined that the traveling that would be required to accommodate father's request would not be in the children's best interests. At the time of the termination trial, father had not visited *427 with his children in nearly five months and characterized his relationship with them as "strained." Given that he was in the process of being evicted from his residence at the time of the trial, father acknowledged that he was not yet in a position to assume the care of the children.
According to the psychologists who evaluated father, his primary failing as a parent is his inability to follow through. They opined that that inability renders him incapable of parenting the children alone. They both described father as a person who, instead of taking any action himself, shifts the blame to others.
The tribe supported termination of both father's and mother's parental rights. The tribal representative, who had been working with the family for more than six years, testified that DHS's handling of this case did not raise any concerns of cultural bias. She also testified that the children are living in their adoptive placements and that the tribe fully supports those placements.
The trial court made the requisite federal and state findings and, on the basis of those findings, terminated the parental rights of both mother and father. The court made all of its findings beyond a reasonable doubt. In particular, the court noted that the "crux" of father's unfitness is his unwillingnessor, perhaps, inabilityto take the necessary steps to protect his children.
On appeal, father advances several arguments. He contends that DHS failed to prove his unfitness beyond a reasonable doubt. He also contends that, because the tribal representative testified as to condition of the family but not as to "the causal relationship between the conditions as they existed and the damage that is likely to result," the testimony of DHS's "qualified expert witness" did not constitute proof beyond a reasonable doubt. Father further argues that, although DHS initially made active efforts to reunify him with his children, when he moved to Grants Pass, "the agency's active efforts all but ended." Finally, father asserts that DHS failed to show that its efforts were unsuccessful because he completed many of the required services.
DHS responds that, even in an ICWA case, not every finding to support a termination must be established beyond a reasonable doubt. According to DHS, ICWA requires that higher standard only in determining whether a parent's continued custody is likely to result in serious emotional or physical damage to the child. As for ICWA's active efforts requirement, because that provision does not invoke the higher standard of proof, DHS asserts that it need only adduce clear and convincing evidence, as required by ORS 419B.521(1). Similarly, DHS argues that it must prove the state ground for termination only by clear and convincing evidence.
Responding to father's specific arguments, DHS insists that it proved beyond a reasonable doubt that father's continued custody of the children is likely to result in their serious emotional or physical damage. First of all, DHS notes, the "qualified expert witness" is not required to testify as to the ultimate conclusion and that, in this case, the tribal representative's testimony amply supports the trial court's finding. Furthermore, DHS asserts, given that this case involves no cultural bias, "qualified expert witnesses" include any expert witness. According to DHS, the testimony by the other expert witnesses clearly supports the trial court's finding beyond a reasonable doubt.
Regarding its efforts to reunite the family, DHS disputes father's assertion that its active efforts ceased after father's move. In addition, DHS contends that it proved that their efforts had been unsuccessful. DHS also disputes that it failed to sufficiently prove that father is an unfit parent. As to those findings, DHS maintains that it need only prove them by clear and convincing evidence, but that, in any event, its proof met the higher, reasonable doubt standard.
We begin with the standard of proof. ORS 419B.521 provides, in part:
"(1) * * * The facts on the basis of which the rights of the parents are terminated, unless admitted, must be established by clear and convincing evidence * * *.
"* * * * *

*428 "(4) Notwithstanding subsection (1) of this section, if an Indian child is involved, termination of parental rights must be supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child is likely to result in serious emotional or physical harm to the child."
Precisely how that standard of proof applies is a question of legislative intent, determined by reference to familiar principles of statutory construction. PGE v. Bureau of Labor and Industries, 317 Or. 606, 610-12, 859 P.2d 1143 (1993). We begin with the text of the statute in context, applying the rules of construction that pertain to textual analysis. Id. If necessary, we also examine the legislative history and other aids to construction. Id.
In examining the standard of proof question, we note that, in at least one prior case, Cain, 210 Or.App. at 240, 150 P.3d 439, we already have stated that ORS 419B.521(4) requires the state to prove all the facts that form the basis for termination of parental rights beyond a reasonable doubt and applied that standard to the facts of that case. We did not expressly engage in extensive analysis of the point, to be sure. But, as a rule, we adhere to our prior interpretations of statutes unless they are shown to have been "plainly" wrong. Newell v. Weston, 156 Or.App. 371, 380, 965 P.2d 1039 (1998), rev. den., 329 Or. 318, 994 P.2d 123 (1999). In this case, our analysis of the text of ORS 419B.521 suggests that the legislature intended that, when an Indian child is involved, all the facts that form the basis for termination of parental rights must be established beyond a reasonable doubt. At the least, that analysis makes clear that, in Cain, we were not "plainly" wrong.
First, ORS 419B.521(4) begins with a "notwithstanding" clause that refers back to subsection (1), which, in turn, refers to a different standard of proof for "[t]he facts on the basis of which the rights of the parents are terminated." We note that the standard of proof described in subsection (1) applies not just to particular facts, but to all the facts that form the basis for the termination of parental rights. Thus, whatever subsection (4) means, it must operate as an exception to subsection (1)-that is, it must be an exception to the rule that all of the facts that form the basis for termination must be established by a lower standard of proof. Werbowski v. Red Shield Ins. Co., 221 Or.App. 271, 276, 190 P.3d 406 (2008) (a "notwithstanding" clause functions as "an exception to the other laws to which it refers").
Moreover, consistent with that reading of the wording of the statute is the fact that the subject of the sentence that comprises subsection (4) is "termination of parental rights." The sentence declares that, notwithstanding the provision requiring a different standard of proof, the "termination of parental rights"not just a subset of facts that pertain to the termination of those rights "must be supported by evidence beyond a reasonable doubt."
DHS insists that ORS 419B.521(4) "merely codifies existing ICWA standards" and imposes the higher standard of proof only as to a particular fact, that is, whether "continued custody of the child is likely to result in serious emotional or physical harm to the child." Although DHS does not explain how its reading of the statute comports with its wording, we can see how the argument could be constructed from the phrasing of the statute. Subsection (4), it could be argued, requires that termination must be supported by "evidence beyond a reasonable doubt * * * that continued custody of the child is likely to result in serious emotional or physical harm to the child." (Emphasis added.) Reading the standard of proof to apply only to the emphasized phrase that follows it, the argument would go, is consistent with the punctuation of the sentence, which surrounds a parenthetical "including testimony of qualified expert witnesses" by two commas. That punctuation, the argument would continue, suggests that the phrase may be, in effect, omitted from the sentence to determine the significance of the phrase that follows it. With the phrase omitted, the argument would conclude, it becomes clear that the reasonable doubt standard applies only to that fact and not to other facts otherwise supporting termination of parental rights.
We grant that the foregoing reading of subsection (4) is at least not "wholly implausible," *429 in that it is arguably consistent with the punctuation of the sentence. See Owens v. MVD, 319 Or. 259, 268, 875 P.2d 463 (1994) (a statute is ambiguous if capable of more than one interpretation that is not "wholly implausible"). Nevertheless, we conclude that it is highly unlikely that it is the reading that the legislature intended. We reach that conclusion for at least three reasons.
First, the source of the punctuation of subsection (4) is easy enough to determine. In adopting subsection (4), the legislature simply borrowed wholesale the phrasing of ICWA, commas and all:
"No termination of parental rights may be ordered * * * in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
25 U.S.C. § 1912(f).
Second, DHS's reading renders the notwithstanding clause of subsection (4) with little, if any, purpose. If the reasonable doubt standard applies only to the additional fact that derives from ICWA, which is not otherwise necessary to prove, then nothing is being excepted from subsection (1). That fact was never subject to the lower standard of proof in the first place, as it derives solely from ICWA.
Third, the context of subsection (4) all but forecloses DHS's reading. A statute in the same chapter, ORS 419B.365, pertaining to permanent guardianships, provides, in part:
"(1) At any time following establishment of jurisdiction and wardship * * *, but prior to filing of a petition [for termination of parental rights], or after dismissal of a petition [for termination of parental rights] if it fails to result in termination of the parent's rights, a party, or person granted rights of limited participation for the purpose of filing a guardianship petition, may file, and the court may hear, a petition for permanent guardianship. * * *
"(2) The grounds for granting a permanent guardianship are the same as those for termination of parental rights.
"(3) The court shall grant a permanent guardianship if it finds by clear and convincing evidence that:
"(a) The grounds cited in the petition are true; and
"(b) It is in the best interest of the ward that the parent never have physical custody of the ward but that other parental rights and duties should not be terminated.
"(4) If an Indian child is involved, the permanent guardianship must be in compliance with the Indian Child Welfare Act. Notwithstanding subsection (3) of this section, the facts supporting any finding made to establish a permanent guardianship for an Indian child, including the finding that continued custody by the parents or Indian custodian would result in serious emotional or physical harm to the Indian child, must be established beyond a reasonable doubt."
(Emphasis added.)
Under that statute, the grounds for a permanent guardianship are the same as for a termination of parental rights. The second sentence of ORS 419B.365(4), read without the phrase beginning with "including" that is set off by two commas, clearly states that, despite the clear and convincing standard of proof specified in that statute's subsection (3), when ICWA applies, all of the findings to support a permanent guardianship must be established beyond a reasonable doubt. We see no reason why the legislature would require a lesser standard of proof for a termination of parental rights than for a permanent guardianship.
Even assuming for the sake of argument that DHS's argument remains plausible, that means only that the statute would be ambiguous, thus requiring an examination of the legislative history. PGE, 317 Or. at 610-11, 859 P.2d 1143. As it turns out, there is little in the legislative history that pertains to the adoption of what is now ORS 419B.521. But what little there is suggests quite strongly that the legislature understood that the effect of the law was to impose a reasonable doubt standard to all facts necessary to terminate *430 parental rights when ICWA is applicable.
What is codified at ORS 419B.521 originated as part of Senate Bill (SB) 1051 (1993). The bill was drafted by the Juvenile and Family Justice Project, a group of judges and other professionals and volunteers working in the juvenile justice system. The project was chaired by Judge Stephen B. Herrell, who explained the origins of the proposal and its intended effect upon its referral to the Senate Committee on Judiciary. Testimony, Senate Committee on Judiciary, SB 1051, Apr 21, 1993, Ex C (statement of Judge Stephen B. Herrell). Judge Herrell explained that earlier efforts to revise the juvenile code neglected to include provisions to address the effect of ICWA. According to Judge Herrell, the bill was needed to "recognize and incorporate the Indian Child Welfare Act." Testimony, Senate Committee on Judiciary, SB 1051, Apr 21, 1993, Ex G (statement of Judge Stephen B. Herrell). He explained that, "[u]nder the Indian Child Welfare Act, parental rights cannot be terminated unless supported by evidence beyond a reasonable doubt." Id. As a result, he explained, it was necessary to adopt, among other provisions, what is now ORS 419B.521(4). Id. Judge Herrell was joined by other representatives of the project in delivering the testimony. Those representatives-including other judges, representatives of the Commission on Indian Services, what was then the Children's Services Division (now DHS), and the Juvenile Rights Project-did not take issue with Judge Herrell's description of the requirements of ICWA or the purpose of SB 1051. See Tape Recording, Senate Committee on Judiciary, SB 1051, Apr 21, 1993, Tape 117, Side A. Judge Herrell and members of the project delivered similar testimony to the House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration. Testimony, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, SB 1051, June 10, 1993, Ex J (statement of Judge Stephen B. Herrell). The legislature ultimately passed the bill without amendment to the portion that is now ORS 419B.521(4).
It may be argued that Judge Herrell was incorrect when he told the Senate and House committees that, under ICWA, "parental rights cannot be terminated unless supported by evidence beyond a reasonable doubt." There is, in fact, a split among courts around the country on just that point. Some courts have concluded that ICWA indeed requires proof of all relevant facts beyond a reasonable doubt when an Indian child is at issue. Compare, e.g., People ex rel. L.O.L., 197 P.3d 291, 294 (Colo. Ct.App.2008) ("If the Indian Child Welfare Act * * * applies, the statutory criteria for termination of the parent-child legal relationship must be established by proof beyond a reasonable doubt."), and In re A.A., 38 Kan.App.2d 1100, 1103, 176 P.3d 237, 239 (Kan.Ct.App.2008) ("The Revised Kansas Code for Care of Children provides that parental rights may be terminated only upon a showing of unfitness by clear and convincing evidence. The Indian Child Welfare Act presents an even greater evidentiary hurdle before parental rights between Indian parents and children may be terminated: unfitness must be proved beyond a reasonable doubt." (Internal citations omitted.)), with Valerie M. v. Arizona Dept. of Econom. Sec., 219 Ariz. 331, ¶ 16, 198 P.3d 1203, 1207 (2009) ("We do not believe that Congress [in enacting ICWA] intended to apply the reasonable doubt standard to state-law findings."). The issue in this case, however, is not what ICWA actually requires, but, rather, what the Oregon legislature was told about what ICWA requires as the basis for its adoption of what is now ORS 419B.521(4). The record on that point is clear.
With that proper standard in mind, and on de novo review of the record, we conclude that the court did not err in terminating father's parental rights in this case. Regarding his unfitness, father was provided with years of intensive services and was unable to take the steps necessary to avoid the circumstances that resulted in the children being removed from his care. We conclude that DHS proved the requisites for a finding of unfitness beyond a reasonable doubt. Further *431 analysis would benefit neither the bench nor bar.
Father's argument that DHS did not prove beyond a reasonable doubt that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child[ren]," 25 U.S.C. § 1912(f), is also not well taken. Because this case implicates no cultural bias, the tribal representative is not the only "qualified expert witness" whose testimony can be considered to support the court's finding. On this record, the testimony by all of the expert witnesses was more than enough evidence to establish, beyond a reasonable doubt, that returning the children to father would likely result in their serious emotional and physical damage. We reject father's contention to the contrary.
We also reject father's contention that DHS's active efforts ceased when he moved to Grants Pass. DHS provided him with the information he needed to access services in his new location. He did not keep his caseworkers updated as to how to contact him and did not take the minimal steps required to access services. Furthermore, DHS provided father with bus passes to travel for visits with his children. The fact that DHS and the tribe decided that it was not in the best interests of the children to travel for the visits does not mean that DHS's efforts were not "active." Despite DHS's efforts, father visited the children only once after he moved and had not seen them in five months at the time of the termination trial. On this record, DHS proved beyond a reasonable doubt that it expended active efforts to reunite father with the children and that those efforts were unsuccessful. The trial court did not err in so finding.
Although father does not argue that the trial court erred in finding beyond a reasonable doubt that termination of his parental rights is in the best interests of the children, we conclude that such an argument would be unavailing on the record in this case.
Affirmed.
NOTES
[1] The court also entered a judgment terminating mother's parental rights to the three children at issue in this appeal, in addition to two other children. Mother did not appeal the judgment.