Argued and submitted February 26, reversed April 15, 2020

In the Matter of J. M. N.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. A. N.,
*Appellant.*

Josephine County Circuit Court
18JU10156; A172321

464 P3d 506

This is a termination of parental rights case subject to the Indian Child Welfare Act of 1978. Mother appeals the court's judgment terminating her parental rights contesting, among other things, the court's determination that she is unfit to parent her child and that termination of her parental rights is in the child's best interest. *Held*: On *de novo* review, the Court of Appeals concluded that, while mother is not currently fit to parent the child herself, the child is placed long-term with extended family members with whom he is bonded, and the state did not prove, beyond a reasonable doubt, facts that would support the conclusion that terminating mother's parental rights is in the child's best interest.

Reversed.

Pat Wolke, Judge.

Holly Telerant, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Reversed.

DeVore, P. J., dissenting.

## MOONEY, J.

This is a termination of parental rights case subject to the Indian Child Welfare Act (ICWA) of 1978, 25 USC sections 1901 to 1963. The juvenile court terminated mother's parental rights after finding her unfit to parent her son, J, primarily due to significant, long-term substance abuse and related issues. ORS 419B.500; ORS 419B.504; ORS 419B.521. Mother appeals the court's judgment terminating her parental rights and alleges 13 assignments of error. By those assignments, mother contests the court's determination that (1) she is unfit to parent J; (2) termination of parental rights is in J's best interest; (3) the Department of Human Services (DHS) used active efforts to prevent the break-up of this Indian family; and (4) mother's continued custody of J is likely to result in serious emotional or physical damage to him.

Mother argues that there are strong bonds between her and J, between her and her older son T, between J and T, and between both her sons and their maternal grandmother, with whom both children live. She argues further that, given those strong family bonds and the lack of evidence that termination of her parental rights to J is necessary to accomplish stability and permanency for J, we should reverse the judgment terminating her parental rights. We conclude that mother is unfit to parent J, but that DHS has failed to prove beyond a reasonable doubt that termination of mother's parental rights is in his best interest. We therefore reverse and remand.

To terminate parental rights on the ground of unfitness, the juvenile court must determine whether the parent engaged in conduct or is characterized by some condition that is seriously detrimental to the child. ORS 419B.504. If the parent is unfit, the court must then determine whether reintegration into the parent's home within a reasonable time is likely. *Id.* If the court determines that to be improbable, the next inquiry is whether termination of parental rights is in the child's best interest. ORS 419B.500. Because this case involves an Indian child, ICWA requires that, before parental rights are terminated, the court must also determine that continued custody by the parent is likely to

result in serious emotional or physical damage to the child. 25 USC § 1912(f); ORS 419B.521(4). And, finally, ICWA requires a finding that the agency used active efforts to prevent the breakup of the Indian family. 25 USC § 1912(d); ORS 419B.498(2)(b)(C).

Our review is *de novo*. ORS 19.415(3). We, therefore, examine the record with "fresh eyes" to determine whether the evidence developed in the juvenile court persuades us that mother is unfit, that termination of her parental rights is in J's best interest, that DHS used active efforts to reunify this family, and that mother's continued custody is likely to cause damage to J. *Dept. of Human Services v. T. L. M. H.*, 294 Or App 749, 750, 432 P3d 1186 (2018), *rev den*, 365 Or 556 (2019). The state bears the burden of proof, and the standard of proof beyond reasonable doubt applies to all facts necessary to terminate parental rights in this ICWA case. ORS 419B.521; 25 USC § 1912; *Dept. of Human Services v. K. C. J.,* 228 Or App 70, 82, 207 P3d 423 (2009).

Mother has two children—J (nearly three years old) and his older brother, T (11 years old). The state seeks only to terminate mother's parental rights to J. DHS first became involved with this family in 2013, when it received a report that mother was using heroin and prescription pills. T was five years old at that time and J had not yet been born. DHS opened a file and investigated the report. Mother placed T in the care of her mother and her mother's husband (J and T's grandparents) and DHS closed the report as unfounded. Grandmother later established a probate guardianship naming herself as T's guardian with mother's consent and without the intervention of DHS. T has lived continuously with grandmother since 2013. Mother has, at times, lived in grandmother's home as well. At one point, she sought an order allowing her to have visits with T, but she has not otherwise sought to dismiss or disrupt the guardianship. Although T remains in the care and custody of his grandmother, he is bonded to mother and her parental rights to him remain intact.

Mother has a long-standing history of substance use and addiction characterized by cycles of significant drug use and intermittent periods of sobriety. She has experienced

negative consequences from her drug use including, for example, being homeless and engaging in activity that led to criminal charges, convictions, and jail time. Mother lived in grandmother's home and abstained from substance use during much of her pregnancy with J, graduating from drug court a month before he was born. But shortly after J was born, DHS received a report that mother and J's father were using drugs in J's presence.[1] DHS opened a file, removed J from his parents' care and placed him with grandmother. DHS filed a dependency petition and, in December 2017, after accepting mother's admissions, the juvenile court found J to be within its jurisdiction. J was 15 months old.

Soon after DHS removed J, mother and father were arrested for heroin possession and for violating conditions of post-prison supervision. Over the course of the next year, mother continued to use substances, was in and out of jail, and had at least two failed attempts at drug treatment. Mother attended less than half her scheduled visits with J. She did not attend a number of appointments that had been scheduled for her psychological evaluation. Those absences resulted in several partial and rescheduled appointments to complete the evaluation. In December 2018, after J had been in substitute care with grandmother for 14 months, the juvenile court changed the case plan from reunification to adoption.

In December 2018, the state filed this termination of parental rights (TPR) case as required by the permanency judgment. In February 2019, the juvenile court received notice that J was an enrolled member of the Cherokee Nation and that ICWA thus applies to this case. That is significant because it adds to what must be established to terminate mother's parental rights and because it raises the standard of proof as to all facts supporting termination; proof must be beyond reasonable doubt.

During the nine months leading up to the TPR trial, mother continued to use substances and never achieved more than 50 days of continuous sobriety by the conclusion

_____

[1] Father stipulated to the termination of his parental rights and he is not a party to this appeal.

of the trial. Mother does not dispute her substance-use history, and she does not dispute her record of poor compliance with DHS and court requirements. She acknowledges the negative impact her substance use has had on her children. Nevertheless, mother points to her success in remaining drug-free for "48 days" at the time of the TPR trial[2] and states that she is committed to following through with continued sobriety.

To determine that mother is unfit to parent J, the juvenile court must conclude that mother engaged in conduct or is characterized by some condition that is seriously detrimental to J. ORS 419B.504. If mother is unfit, the court must then determine whether reintegration into mother's home within a reasonable time is likely. *Id.* DHS alleges mother is unfit to parent J because of her substance use, mental health condition, failure to maintain regular visitation with J, lack of effort to adjust her circumstances to make J's return home possible, lack of effort to obtain a suitable living situation for J, failure to present a viable plan for J's return to mother's custody, and failure to provide a safe and stable home for J. The court concluded that DHS met its burden on each of those allegations. And, although mother contests the court's determination that she is unfit to parent J in her second through tenth assignments of error, she offers no argument in support of those assignments. We do not understand mother's position to be that she is presently a fit parent for J, or even that his return to her custody within a reasonable time is likely. On review of the record, we are persuaded beyond a reasonable doubt that mother is not presently fit to parent J and, further, that safe return to her custody is not likely to occur within a reasonable period of time. We reject those assignments of error without further discussion.

Determining whether termination of mother's parental rights is in J's best interest must focus on J's needs. This "best interest" inquiry is not weighted with a presumption in favor of adoption solely because mother is found to be unfit. *Dept. of Human Services v. T. M. D.*, 365 Or

---

[2] Drug test results in the record reflect that urine collected from mother on July 22, 2019, was positive for opiates. The last day of the TPR trial was September 3, 2019. Assuming mother abstained from use from July 23 through September 3, 2019, then she had 42 days clean and sober during that time frame.

143, 161, 442 P3d 1100 (2019). The question instead turns on whether J's best interest will be served by termination of his mother's parental rights. *Id.* at 162-63. We summarize the pertinent evidence as follows.

Dr. Sage, a licensed clinical psychologist, evaluated J in January 2019 at the request of DHS. Specifically, she was retained to "obtain diagnostic clarification and treatment recommendations regarding [J], with a focus on his permanency and parenting needs." She reviewed records, spoke with grandmother, observed J at play, and administered developmental testing. Sage concluded that J is developmentally "on track," without any intellectual or cognitive delays and without adjustment or other social-emotional disorders. He exhibited appropriate attachment behaviors toward his grandmother and step-grandfather, consistent with the fact that they are his primary caregivers.

Sage opined that, in light of J's age, developmental stage, and attachment needs, "he should achieve permanency as soon as possible." She noted that he is in a very sensitive window of time when he is most capable of developing strong and healthy attachments to his primary caregivers. "Achieving permanency" would be stabilizing for J "and prevent poor outcomes." Additionally, the "opportunity to live and bond with his older brother would also be considered a protective and stabilizing factor for [J] and provides the opportunity to build another significant relationship with an important family member, thereby increasing his social and relational network." Sage noted the role that the lack of "consistent 'competing' relationships [in J's life]" (as Sage described J's visitation with mother) has played in the development of his attachments to his grandparents. She cautioned that, as his bond with his grandparents strengthens, the risk that he might suffer "attachment loss and disruption" if he transitions out of their home increases. Sage nevertheless acknowledged J's bond with his mother, and she agreed that it would be important for J to have continued contact with her.

Dr. Morrell, a licensed clinical and forensic psychologist, evaluated mother at the request of DHS in a series of appointments, the last of which occurred in October 2018.

He testified about his evaluation of mother, his diagnostic conclusions, and his recommendations. The evaluation was comprehensive and included psychological testing, intelligence testing, interviews of mother and grandmother, and review of DHS materials. Mother's intellectual testing was essentially normal, indicating "adequate intellect from the standpoint of minimally competent parenting." Morrell noted "relatively strong scores" in "common sense reasoning and judgment," but also the possibility of an "ADHD issue."

In his evaluation of mother, Morrell used standard psychometric testing tools but cautioned that the testing was "stale" and that the findings should "be seen as provisional, not conclusive." No further testing was conducted.

Morrell diagnosed mother with depression, opioid related disorder, methamphetamine related disorder, cannabis related disorder, cocaine related disorder, and a personality disorder. He offered two "formulations" for mother's "psychological profile" and indicated that "either one [is] effectively terminal for parenting purposes." The first formulation is that mother is a "very heavily drug addicted" person, "owing to 'dual diagnosis' self-medicating factors." The second formulation is mother's drug addiction together with "personality disordered features," including those that are narcissistic, histrionic, and antisocial. In the end, he discounted the impact of those mental health diagnoses when he testified about his recommendation for intensive drug treatment rather than for mental health treatment:

> "Her ability—if she's remaining clean and sober, that's the best indicator that other things might be falling in line, and that's the area that needed to receive focus.
>
> "I could be asked about the mental health treatment. I already said in my report I felt that that was overstated and overplayed, so I didn't see that as a big part of this."

Finally, Morrell testified that he did not see reunification "being a reasonable prospect." He opined that "the clock is running out in this case. Unfortunately, it probably ran out for [T]. *** And, absolutely, I would like not—that not to happen to [J] as well." Nevertheless, Morrell agreed that it would be important for J to have continued contact with mother.

Lisa McKibben testified and offered her opinions as a tribal representative and expert. Her expertise was stipulated to by the parties. McKibben testified that DHS had used active efforts in this case and that continued custody with mother would likely cause J emotional or physical damage. She also testified that placement with J's grandmother "complies with the placement preferences" of the tribe. Notably, however, McKibben was not asked to give, and she did not offer, an opinion as to whether termination of mother's parental rights is in J's best interest.

Lori Steele testified that she was the ongoing DHS caseworker assigned to this family from November 2017 through about March 2019. Rachael Blackwood testified that the file was transferred to her from Steele and that she is the current DHS caseworker assigned specifically as the "permanency caseworker." Both Steele and Blackwood testified that J is strongly bonded to his grandmother and his brother, and they each acknowledged the existence of a positive bond with mother as well. Describing why the agency concluded that adoption, and thus termination of mother's parental rights, was in J's best interest, Blackwood testified:

"When you're looking at [J], he has resided in his current placement for most of his life, with the exception of one, one and a half months, even though some of that was with his mother. So he has a very strong attachment, very strong bond with his current placement who we do intend as being the adoptive placement in that his brother also resides there, and he has a close bond there.

"You look at his age. You look at the critical window of the attachment and the primary attachment, and, even during that time, even if his mom was living there, the grandparents did provide that care, specifically grandpa. And he did take [J] to medical appointments. He took to— you know, like, when he would fall down, feed him, daycare, things like that. And so, his—you know, he's coming up on three years, so that's most of his life. Let's see.

"His permanency needs. You know, we look at his physical and emotional safety. That short window of time when he was prior to DHS involvement was living outside of the home. He was exposed to parents and their drug use within the room that they were in. There were drugs and drug

paraphernalia found by relatives living in that home, so there's concern about his safety there.

"It's important for him to be able to have that safety, security, that he is going to be raised in a home not having to look at potential of disruption now, two years from now, five years from now. He's able to still have that relationship with both of his parents, as long as they remain healthy, so it's not cutting off that relationship through an adoption, especially with it being a relative placement and that provider being willing and open and recognizing his needs to know who his parents are."

According to Blackwood, termination of mother's parental rights is in J's best interest because it would remove the possibility of future disruption of the bond between him and his grandmother by eliminating the risk that mother might petition the court for custody at a later date.[3]

Grandmother testified that mother had been a "straight-A student" involved in sports and church activities until she became involved with drugs when she was 15 or 16 years old. Mother's use of substances was intermittent until her early 20s, when her use increased, she made poor relationship choices, and she began to experience periods of criminal activity and incarceration. At times, mother would "go missing" for days or weeks without any contact. Grandmother also testified that mother often places the men in her life above the needs of her children. The impact on J's life has been significant. With the exception of one month, J has lived with grandmother, his step-grandfather, and T for his entire life. Grandmother has, at times, feared for mother's safety due to her drug use and poor choices. For the same reasons, she fears for the safety of J and T when they are in mother's care.

Grandmother testified that she and her husband are committed to J and his brother and that they are a family:

"Q:   From what you observe of [J] and [T], are you acting like a family?

_____

[3] We note that permanent guardianship eliminates the risk that mother might petition the court to dismiss the guardianship at a later date. ORS 419B.368(7).

“A:   We are a family, yes.

“Q:   And so is that now engrained in those children, having been with you this long?

“A:   Yes.”

She indicated that although J is only 3 years old, “[h]e knows that this is his home. He’s born and been raised there. All his stuff is there.” When asked about her ongoing commitment to J and her thoughts about what would be best for him, she offered this testimony:

“A:   Right now, [J] is happy. [J] is secure. [J] is—this is [J’s] home. This is—

“Q:   Sure.

“A:   —his family.

“Q:   And you want that to continue, don’t you?

“A:   I do. I know he loves his mom. I know his mom loves him. And I don’t know what the future holds. All I know is the here and now.

“Q:   And you’ve been told and you’ve heard all through the last few parts of this trial that there is only one plan that’s the most permanent plan.

“A:   Correct. Correct.

“Q:   And is the plan of adoption one you would support?

“A:   Yes, I would support that.”

When asked whether mother has tried to get T’s guardianship dismissed or has otherwise tried to disrupt the guardianship, grandmother testified that, at one point, mother “did go down to the courthouse and talk to the judge to get in there a stipulation of when she could see [T], how often. But I honestly don’t know what that was about.” The following questions and answers were asked and given concerning the relative merits of guardianship and adoption:

“Q:   Right. And if that situation were to also occur where [mother], with respect to [J], could continue to go to court to try to get more visits and more overnights and

more contact—even if she could never have custody—there are some plans that talk about that.

"A:   Right.

"Q:   She could go to court, and she could continue to bring you to court for many, many years.

"A:   Right.

"Q:   Do you see that as being in [J's] best interest?

"A:   No. No. I don't see it being in anybody's best interest."

Grandmother testified that, in any event, she believes it is important that the relationship between J and his mother be maintained.

We are as unpersuaded by the evidence here, as we were by the evidence in *T. L. M. H.*, that termination of mother's parental rights would be in J's best interest. 294 Or App at 753. This is especially so given the heightened standard of proof that applies to this ICWA case. T has lived with grandmother under the formal structure of a guardianship for seven years, and there is no evidence that mother has sought, or threatened, to interfere with that guardianship. With the exception of about one month, J has lived with grandmother his entire life, and there is no evidence that mother has attempted to disrupt or undermine that living arrangement. And, according to Sage, because mother has not actively "compet[ed]" with grandmother for that primary relationship, his attachment to her has grown strong. Sage discussed the important role that a strong bond between J and his older brother might play, almost as if that had not yet happened. But J already shares a close bond with T and mother has not interfered with that. Sage discussed the need to achieve permanency for J, emphasizing the importance of continuing his placement with grandmother. Missing from her testimony, however, is any explanation about why mother's rights would need to be terminated to "achieve permanency."

We are persuaded beyond reasonable doubt that J is also closely bonded with mother. The parties do not seriously dispute that. And, of those witnesses who were asked,

none disputes the importance of leaving all J's family bonds intact for him.

Sage testified that J "should achieve permanency as soon as possible." J, like all children, has a right to "permanency" in a safe home. ORS 419B.090(2)(a)(A). But, the importance of permanency cannot be equated with any particular idea of what that permanency should look like. "The juvenile code does not permit decisions to terminate parental rights to hinge on abstract notions of permanency. Rather, the juvenile code demands a persuasive factual showing that termination of parental rights to a particular child is in that child's best interest, in view of the particular needs and circumstances of the child." *T. L. M. H.*, 294 Or App at 752-53. J is a healthy, normally developing child without evidence of special needs. He is developing appropriate attachments to his primary caregivers (grandmother and her husband) and also to his brother and his mother. The record reflects that those family bonds are strong, and no one disputes that they should continue.

The notion that terminating mother's rights is in J's best interest because that would prevent the future disruption of J's attachment to his grandmother and step-grandfather does not ring true. The primary concern urged upon us is that mother will later file a motion to vacate a guardianship or otherwise seek custody of J if her rights are not now terminated. We note first that mother would not be permitted to file a motion to dismiss or vacate a permanent guardianship. ORS 419B.368(7). Moreover, the record does not contain evidence that J's need for permanency includes the need for "legal assurance that no court will ever change his placement." *T. M. D.*, 365 Or at 165. And, finally, disruption of important family bonds occurs even in families where DHS is never involved—by death or divorce, for example. Those possibilities exist for J regardless of the status of his mother's parental rights. That J enjoys strong bonds with several family members will likely serve him well in the event of unanticipated disruptions in the future. We view the importance of those family relationships understanding that J is still in the time-sensitive window that Sage explained is important for developing those bonds in the first place.

To terminate mother's parental rights now will, of course, immediately disrupt the legal relationship between J and mother. His legal relationship with T would also necessarily change. That change in the sibling relationship would not be prevented by grandmother adopting J because she is not T's legal parent. We are not persuaded that the impact of those changes on J's family relationships would be in his best interest. While J may not immediately understand the significance of the loss of legal relationships with mother and T, the unexpected death or disability of mother or grandmother may well yield disparate custody and support decisions for J and T in the future. The potential impact of that on J's well-being cannot be ignored.

Grandmother testified that her goal is to keep J safe in her home where he has always lived. Her view that adoption is superior to guardianship for J was suggested by counsel's leading questions and came only when she agreed that she had "heard" at trial that adoption offered the most permanency and that guardianship could result in many more court appearances. That has not been her experience with mother in the context of T's guardianship. And, as discussed earlier, mother would not be permitted to seek dismissal of a permanent guardianship. ORS 419B.368(7).

Mother is not currently fit to parent J herself. Of that, there is no reasonable doubt. But J is well cared for by grandmother. Mother has not interfered with that and there is no evidence that she plans to do so. To the contrary, mother has cooperated with the ongoing placement of her children with grandmother. J is bonded to grandmother and step-grandfather, his brother, and his mother, and he is doing well in the only home he has ever known. To persuade us that terminating mother's parental rights is in J's best interest in this ICWA case, the underlying facts must be proven beyond reasonable doubt. In our view, the state has not met that burden, and we are not persuaded that termination is in J's best interest. Resolution of that issue resolves the appeal and requires reversal. We need not—and do not—address the remaining assignments of error.

Reversed.

**DeVORE, P. J.,** dissenting.

The majority accepts the judgment of the juvenile court that mother has engaged in conduct that is seriously detrimental to J; and that reintegration into her home within a reasonable time is not probable.[1] 303 Or App at 601-02 (citing, *inter alia*, ORS 419B.504; ORS 419B.500; ORS 419B.521(4); ORS 419B.498(2)(b)(C)). Despite the conclusions of the juvenile court, a psychologist, and grandmother (who is both mother's own mother and J's lifelong caregiver), the majority, in the exercise of *de novo* review, concludes that termination of mother's parental rights is not in J's best interest. I respectfully disagree for reasons that are both general and specific.

My general concern is that, when a child within the jurisdiction of the juvenile court has the good fortune to find an interim placement with a loving relative who is willing to adopt and who poses no threat to the bond between child and parent, that same good fortune would seem to set a precedential standard that prevents adoption, despite the best interest of the child. That is to say, I fear the precedent that we *might appear* to set in this case but do not intend to set. To explain my concern, I borrow from the concurring opinion of the leading case.

In *Dept. of Human Services v. T. M. D.*, 365 Or 143, 161, 442 P3d 1100 (2019), the Supreme Court held, first, that, when a parent has been found to be unfit, there is neither a preference for nor a presumption of termination of parental rights. And, second, the court held, on *de novo* review in that particular case, that the termination of the mother's rights was not in the child's best interest. *Id.* at 163-66. The child's maternal uncle and aunt were the foster parents and were willing to adopt. *Id.* at 145. A psychologist, MacPhail, had assessed the child, testified to a need for permanency, but was unable to answer the question whether adoption was

_____

[1] Although the majority does not reach the other issues, I agree with the trial court that custody with mother is likely to result in serious emotional or physical damage to the child and that, in relation to this Indian child, DHS has made active efforts to avoid the breakup of the family. McKibben, a representative of the Cherokee Nation, testified that the tribe participated in the case, that she had reviewed DHS services to the family, that DHS had provided active efforts to avoid the breakup of the family, but that those efforts had failed.

the best plan for the child. *Id.* at 149. The DHS caseworker, Blackwood, testified that adoption was preferred because the parent might come back to disrupt the *placement* and opined that "when we can't rule out adoption, we need to go for it."[2] *Id.* at 150. The juvenile court, however, saw a permanent guardianship as an option to preserve maternal family relationships and concluded that termination of mother's rights was not in the child's best interests. *Id.* at 153, 163. The Supreme Court agreed, noting that a *permanent* guardianship does not allow a parent's motion to vacate the guardianship.[3] *Id.* at 165 (citing ORS 419B.368(7)). Deeming permanent guardianship sufficient to provide permanency, the court determined the child's best interest was maintenance of the relationship with the mother and the larger family. Termination of the mother's rights was denied. *Id.* at 165-66.

In a concurring opinion, Justice Balmer observed, "this is a close case." *Id.* at 166. He wrote separately to say that the court's "best interest" holding "does not create a sea change, or suggest that other courts in other cases have been too quick to find that termination of parental rights is in a child's best interest." *Id.* at 167 (Balmer, J., concurring). He stressed that *T. M. D.* "should not be taken to set forth a rubric against which juvenile courts must measure the facts of future cases." *Id.* (Balmer, J., concurring). He explained:

> "A court should not, in short, adjudicate what is in a child's best interests by a process of fact-matching between the case at hand and this one. *** The application of the 'best interest of the child' standard requires careful attention to the subtleties of a given case, and is for that reason inimical to the fact-matching between similar cases that may occasionally prove productive in other legal contexts. A future case with facts resembling those of this case in their broad strokes—involving, say, a parent who has no realistic possibility of being able safely to care for his child, but with whom the child has bonded and maintains limited but

---

[2] Disruption of the placement was the concern. There was no mention of concern about visitation or further legal proceedings.

[3] In *Dept. of Human Services v. A. D. J.,* 300 Or App 427, 435-36, 453 P3d 619 (2019), we explained that, unlike a permanent guardianship, a so-called durable or general guardianship *does* permit a parent to seek to vacate it.

positive contact—need not come out the same way, even in the absence of some obvious distinguishing feature. It may be enough to say that those factors, though similar, have a differen[t] balance in that case."

*Id.* (Balmer, J., concurring). He underscored that ORS 419B.500 requires courts to make an individualized determination in each case, alert to its "subtleties." *Id.* at 167-68 (Balmer, J., concurring).

I take Justice Balmer's caution to mean that *T. M. D.* does not set a precedent that means, whenever a child is happily placed with a relative and the child has a positive relationship with an unfit parent, guardianship must trump adoption—nor that such is the rule even when the foster relative, not the parent, has raised the child virtually all the child's life. Like Justice Balmer as to *T. M. D.*, I am concerned that this case could be misconstrued to stand for such a proposition. I would much prefer to join the majority opinion to point out the "subtleties" that would deny adoption, but I cannot.

My specific concern is, given the subtleties of this case, that the juvenile court did *not* err. The trial court that observed the witnesses got it right. The majority dismisses the testimony of Sage, the child psychologist who recently assessed J, and Hubbard, mother's mother, J's grandmother, and lifelong caregiver. The majority speaks of "abstract notions of permanency" and no "persuasive factual showing" that adoption is in J's best interest. 303 Or App at 611. In my opinion, however, the record contains evidence beyond a reasonable doubt, not an absence of evidence or mere legal abstractions. That evidence comports with the juvenile court's judgment.

Sage was engaged to assess J and make professional recommendations on J's permanency and parenting needs. Sage first advised that, due to J's age, developmental stage, and attachment needs, he should be given permanency as soon as possible. Security and safety in early years, she explained, is important both in the short-term and in the long-term, as a template for trust and relationships later in life. She next recommended for J the "highest level of permanency." Without such permanency, she feared "a serious

risk." Unlike the psychologist in *T. M. D.,* 365 Or at 149, Sage *did* express a preference between adoption and guardianship. She understood adoption to be the highest level of permanency, and she explained her preference in more ways than the obvious.

As Sage explained, adoption avoids the risk to the child of disruption "in who that parent or caregiver is" and provides "a narrative to the child that that person is going to be their forever person, *** their forever home." With a lesser plan, the child may get messages from the parent that someday the child would be able to come back with the parent, which can be confusing to the child and make it difficult for the caregiver to reassure.

In addition, adoption provides the caregiver greater authority in setting "boundary lines" about how another person is involved in J's life. Sage testified specifically that, in J's best interest, there are issues with those lines if the plan is anything less than the highest level of permanency. With a plan less than adoption, "it's harder for *** the permanent caregiver to feel like they have the autonomy and ability to and strengths to be able to set healthy boundaries for the child."

Before concluding, Sage acknowledged that, in this family, adoption could still allow visitation and an ongoing relationship between J and mother. But, Sage concluded with certainty, "the highest level of permanency is in the best interest of this child."

Sage's reasons and conclusions were made concrete when Hubbard, J's grandmother, testified. Hubbard had taken custody of J's older brother, T, and she had arranged a guardianship with mother's consent through the probate court. J was almost 3 years old at time of the hearing, and, except for a month or so, had lived with his grandmother his entire life. When Hubbard mentioned, at trial, that T expressed disappointment when mother failed to call as promised, Hubbard was asked if T knew about mother's drug use. Hubbard replied:

"Yes. Yeah. We've talked. We can only say so much at his age, so we kind of keep it basic for him, but, at this

age, he does know that she has a problem, that—I let him know that mom loves him very much, but mom is addicted to drugs, and the drugs are ruining her life. You know, and he understands all that. And I tell him, 'That that's the reason why [J] and you are here with us, because, as long as mom is on drugs, it's hard to be a good parent. It's hard to be focused and there.' And he understands. He's a smart boy. He knows."

Some time ago, Hubbard had feared for the safety of T and J, "because of the people that [mother] brought into her life or that she associated with." Hubbard and her husband locked their gate, fearing "drug people" or "gang members." When they established T's guardianship, they set some rules that "were pretty strict." They insisted that mother stay clean, be in a program, and follow through. And, they told mother, "If you say you're going to call [T], you call [T]." At times, mother complained about being unable to take T. Hubbard insisted on accompanying them because "the people that she was with that were concerning to us." Hubbard learned that mother went "down to the courthouse" to "talk to the judge to get in there a stipulation of when she could see [T], how often."

Hubbard testified that she favored adoption as the most permanent plan. When asked why, she explained:

"It's in the best interest. I want to keep [J] and [T] safe and in a good environment. *** [I]t boils down to their needs, and they are at the top of the list."

She said that she did not want to see mother excluded from the children's lives. Yet, if mother "could continue to go to court" over visitation or contact with J, as she had with T, even if that could not threaten custody, Hubbard did not see that to be in J's best interest. As long as mother was clean and good for the children, Hubbard had no problem with mother being a part of their lives. Hubbard testified that she wanted adoption, making her the parent.

The testimony of Sage and Hubbard is much more than a legal abstraction or a failure to make a factual showing why adoption is in J's best interest. Their testimony shows why adoption *is* in J's best interest. Adoption was not just about custody. It was also about giving Hubbard

authority to set rules for mother's involvement in J's life to assure his well-being, and doing so in a way that trusted Hubbard's love of her own daughter to preserve the mother-child relationship while setting rules flexibly, reasonably, and without litigation. In my view, that evidence should decide this case. Instead, the majority opinion turns on a half dozen different points. I separate and address them in turn.

(1)   The majority asserts that "the record does not contain evidence that J's need for permanency includes the need for 'legal assurance that no court will ever change his placement.'" 303 Or App at 611. But the record *does* contain such evidence in the testimony of psychologist Sage who explained the preference for adoption in terms of the every-day need for a caregiver to be able to reassure a child that she is the forever parent providing the forever home.

(2)   The majority dismisses the concern that mother might seek custody and disrupt the bond between J and his primary caregiver, his grandmother. The majority observes that "disruption of important family bonds occurs even in families where DHS is never involved—by death or divorce for example. Those possibilities exist for J regardless of the status of his mother's parental rights." *Id.* I find the point unpersuasive. Bad things happen, but that does not mean we should be indifferent to reducing their probability.

(3)   The majority posits that terminating mother's rights would "immediately disrupt the legal relationship between J and mother. His legal relationship with T would also necessarily change." *Id.* at 612. I suggest that the personal import of those formalities is exaggerated. To be sure, mother's *legal* relationship with J would be terminated, but Hubbard repeatedly testified that she wanted mother in the boys' lives. Sage, likewise, contemplated a continued relationship between mother and J. The potential worst-case scenario need not be assumed as probable fact, particularly where the evidence shows the opposite—a favorable scenario in the case at hand. Similarly, the change in the comparative legal status as between siblings J and T, simply due to J's adoption, will not change their day-to-day contact or their emotional ties with each other.

(4) The majority asserts that termination of mother's rights to prevent disruption of J's relationship with Hubbard and husband "does not ring true." *Id*. As the majority observes, a permanent guardianship does not permit a parent to seek to vacate the guardianship. ORS 419B.365 (providing for permanent guardianship); ORS 419B.368(7) (a parent may not move to vacate a guardianship under ORS 419B.365). I would be quick to agree that, in a case where a psychologist offers no preference or reason for adoption over a permanent guardianship and the facts show nothing more, a permanent guardianship can provide the stability needed. *See T. M. D.*, 365 Or at 149, 165-66 (finding requisite permanency in permanent guardianship). However, a permanent guardianship is only one of two forms of guardianship. A so-called general or durable guardianship *can* be vacated on motion of a parent. *See* ORS 419B.366 (general guardianship); ORS 419B.368(1) (any party may move to vacate a guardianship). In this case, mother had acquiesced in a general guardianship of T, but there is no assurance that she would acquiesce in a permanent guardianship.[4]

Even if permanent guardianship were the one of two options that might later be decided, it is not the equivalent of adoption. The witnesses correctly understood that adoption *is* the "highest level of permanency." Our statutes make that plain to any reader. The court, on its own motion, or any party, other than a parent, is free to seek to vacate the permanent guardianship. *See* ORS 419B.368(1) ("The court, on its own motion or upon the motion of a party * * *, may review, modify, or vacate a guardianship order."); ORS 419B.368(7) ("[A] parent may not move the court to vacate a guardianship once a guardianship is granted under ORS 419B.365."). Although improbable, DHS, persuaded by a motivated parent, could move to vacate a permanent guardianship, even when the guardian has been the lifelong caregiver. Of greater importance, particularly in this case, a parent can file a motion with court seeking to *review or modify* a permanent guardianship. *See* ORS 419B.368(7)

---

[4] Indeed, mother's counsel cross-examined psychologist Sage, challenging her recommendation for adoption with the prospect of J and T together by suggesting the possibility that mother could seek to vacate T's guardianship and regain his custody.

(only prohibiting a parent from seeking "to vacate" a guardianship) (emphasis added).

(5) Setting boundary lines on behavior or rules on visitation to protect J was one of the prime reasons Hubbard gave for preferring adoption. Hubbard already had experience with mother making inquiry at the courthouse about Hubbard's efforts to protect T from mother when using drugs or when with unsavory companions. Hubbard wanted to continue to involve mother in the boys' lives, but, given mother's drug history, Hubbard wanted rules about the boys' safety, and she wanted their well-being to be a matter of family discussion, not litigation. Sage's testimony about adoption supported Hubbard in explaining that adoption allows the caregiver greater authority in setting "boundary lines" for how another person is involved in J's life.

(6) The majority rejected Hubbard's testimony as "suggested by counsel's leading questions" or prompted by mention of many more court appearances. 303 Or App at 612. To disregard her testimony as merely the result of "leading questions" is dismissive. The majority accords her testimony lessened credibility on a critical issue and does so based on one or two isolated questions rather than in view of the whole of Hubbard's testimony. Although we do review *de novo*, we know that the trial judge is in the better position to observe the witnesses and assess their demeanor in evaluating their credibility. *Dept. of Human Services v. R. K.*, 271 Or App 83, 89, 351 P3d 68, *rev den,* 357 Or 640 (2015). Here, we have no justification in disregarding Hubbard's testimony. She testified from her experience with her daughter's history of drug use and questions about visitation with J's brother T. Her testimony was about the central importance of permanency and a thoughtful management of visitation. She explained in concrete terms why adoption was superior. Her testimony should be central, not inconsequential.

In sum, Sage and Hubbard gave concrete and compelling testimony that explained why adoption provided J the highest form of permanency. Termination of mother's rights opens the door to adoption, and adoption better protects J from the risks of mother's troubled history of drug use. Adoption provides J his forever home and provides his

caregiver flexible authority to enforce boundary lines on visitation, which may change as readily as mother's success with sobriety. I am persuaded beyond a reasonable doubt that adoption was in J's best interest.

I respectfully dissent.